# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
March 30, 2010 Session at Knoxville

## DETRICK COLE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-01221     James C. Beasley, Jr., Judge**

_____

**No. W2008-02681-CCA-R3-PD  - Filed March 8, 2011**

_____

The Petitioner, Detrick Cole, appeals as of right from the judgment of the Shelby County Criminal Court denying his petition for post-conviction relief. A Shelby County Criminal Court jury found the Petitioner guilty of the premeditated first degree murder of Santiefe Thomas. The jury also sentenced the Petitioner to death after finding that the Petitioner had previously been convicted of one or more felonies for which the statutory elements involved the use of violence to the person, see Tenn. Code Ann. § 39-13-204(i)(2), and that this aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt. The Petitioner's conviction and sentence were affirmed on direct appeal by the Tennessee Supreme Court. State v. Cole, 155 S.W.3d 885 (Tenn. 2005). Following the filing of a timely petition for post-conviction relief and a full evidentiary hearing, the post-conviction court denied relief. On appeal to this court, the Petitioner presents a number of claims that can be characterized in the following categories: (1) the Petitioner's trial counsel were ineffective, (2) the Petitioner's appellate counsel were ineffective, (3) the Petitioner is statutorily ineligible for the death penalty, and (4) Tennessee's death penalty statutory scheme is unconstitutional. Following our review, we reverse, in part, the judgment of the post-conviction court and remand this case for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed in Part; Reversed in Part; Case Remanded for Resentencing.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR, .J., joined.

Jeffrey P. Yarbro, Gene L. Humphreys, and Kelly A. Gleason, Nashville, Tennessee, for the appellant, Detrick Cole.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael Moore, Solicitor General; Angela M. Gregory, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts presented at trial and sentencing hearing

In the supreme court's opinion affirming the Petitioner's conviction and sentence, the supreme court presented the facts from the Petitioner's original trial and sentencing hearing as follows:

### A. Guilt Phase

The proof offered by the prosecution at trial established that, around 2 a.m. on October 17, 2000, the twenty-year-old defendant, Detrick Cole, killed the victim, twenty-seven-year-old Santeife Thomas, by shooting him twice in the head. The evidence established that Thomas had returned home from work around 12:30 a.m. on October 17 and left shortly afterward in his late-model Mitsubishi Galant to visit a friend. Thomas was next seen at the Ridgemont Apartments in North Memphis, where he agreed to drive a person identified as "Little E" to the Raleigh Woods Apartments. The defendant and fourteen-year-old Andropolis Wells accompanied the victim and "Little E." Wells, testifying for the prosecution, related that after Thomas dropped off "Little E" at the Raleigh Woods Apartments, the defendant asked Thomas to drive him to the Garden Walk Apartments. The defendant directed Thomas to the back of the apartments and asked Thomas to park the car near an area overgrown with grass and weeds. After Thomas parked, all three men exited the car. Thomas and Wells waited near the car while the defendant left to get crack cocaine from "Jerry." The defendant returned a short time later and said "Jerry" would bring them some drugs.

Wells waited at the car, but the defendant and Thomas walked into the overgrown area. Wells heard the defendant repeatedly telling Thomas to open his mouth and saw the defendant pointing a gun at Thomas's face. Thomas, who had no weapon and made no aggressive move toward the defendant, backed away and repeatedly told the defendant to "stop playing." Wells then heard two gunshots. The defendant ran from the bushes with a set of keys, but, apparently realizing that he had the wrong keys, the defendant went back into

-2-

the overgrown area and returned with another set of keys. The defendant, who had blood on his hand, told Wells to get into the car. Shocked by the shooting and fearing for his own life, Wells accompanied the defendant in the victim's car back to the Ridgemont Apartments. There, the defendant removed two shells from the murder weapon, rubbed them with his shirt, and threw them into a garbage can. The defendant and Wells then went to an upstairs apartment and left the gun with a person known to Wells as "Jewel."

When the defendant and Wells returned to the victim's car, the defendant discovered that he had lost his electronic organizer during the killing and expressed fear that its discovery would lead to his apprehension. Thus, the defendant and Wells drove the victim's car back to the apartment complex to search for the organizer and parked in a driveway near the murder scene. They searched for a short time; the defendant rolled the victim's body over, but he did not find the organizer. When they returned to the victim's car to leave, they noticed a man standing outside across the street looking at them. At the defendant's instruction, Wells spoke briefly to the man before he and the defendant left.

Wells remained with the defendant for two days after the murder. Before the defendant dropped off Wells at Wells's home, the defendant told Wells that he had shot Thomas with a .44 caliber handgun because Thomas owed him fifteen dollars. Wells remarked, "Fifteen dollars? Man I could have gave you fifteen dollars." The defendant replied, "N----r gonna start respecting me."

Wells's testimony was corroborated by the testimony of Marcus Puryear, who lived near the crime scene. At approximately 2 to 2:30 a.m. Puryear had been sitting in his car, talking on a ham radio when he heard "two loud gunshots-blasts." He saw a car speeding away from the direction of the gunshots, and from the sound of the car, Puryear identified the vehicle as having a small, four-cylinder engine. Later, while looking out the window of his home, Puryear saw a car pull into a driveway immediately across from his residence. Two African-American males left the car and walked around into the area overgrown with weeds, near where the gunshots had sounded. After three or four minutes, the men returned to the car. By this time, Puryear was standing outside looking in their direction. One of the men walked over and asked if Puryear knew a person named Carlos or Michael who lived across the street. When Puryear answered that he had never heard of anyone by that

name living there, the two men left. Puryear had not seen these men before and decided to write down the tag number, color, make, and model of the car they were driving. Puryear provided this information to the officers who discovered Thomas's body and investigated his murder. The description and tag number Puryear provided matched the description and tag number of the victim's vehicle.

On October 18, 2000, Robert Eric Adams, a resident of the Ridgemont Apartments, saw the defendant sitting on the steps to Adams's apartment. Because the defendant was looking "down," Adams asked him what was wrong. The defendant said that he and his girlfriend had fought. During this conversation, the defendant stunned Adams by telling Adams that he had killed Thomas. The defendant said that Thomas had been taking him somewhere to get marijuana when the defendant asked Thomas about money Thomas owed him. Thomas promised to pay the defendant on Friday. After they arrived at their destination and left the car, the defendant continued to ask Thomas about the debt. Thomas again said that he would pay the defendant on Friday and offered to include an additional one hundred dollars for the delay. Believing that Thomas was lying, the defendant took out a pistol and shot Thomas in the head and a second time in the face to assure that Thomas was dead. The defendant told Adams that he had hidden Thomas's car. At the defendant's request, Adams drove the defendant to the Garden Walk Apartments, where the defendant pointed to Thomas's body and said that he had dropped his "Rolodex" and was trying to find it. Searching the grass near the body, the defendant found his organizer. The two men then returned to the Ridgemont Apartments. Adams testified that later that afternoon, Thomas's mother came to the apartments and asked if anyone had seen her son. The defendant told her that Thomas might be "hanging out" or "partying." At some point thereafter, Adams told an acquaintance, Carlos Williams, that the defendant had killed Thomas, but Adams did not tell Williams the location of Thomas's body.

On the evening of October 19, 2000, in an action unconnected with this case, the police conducted a raid at the Ridgemont Apartments and arrested Carlos Williams for unlawful possession of a weapon. Williams, who apparently knew that Thomas's mother had filed a missing persons report, told the police what Adams had told him about the defendant killing Thomas. On October 20, the police questioned Adams, who told them what the defendant had said about the murder, except the location of Thomas's body.

-4-

Thereafter, the police arrested the defendant as he was leaving a convenience store. At the time of his arrest, the defendant had a Mitsubishi ignition key on his person. Arresting officers were unaware of the significance of the key and allowed the defendant to retain it. By the time investigators first spoke with the defendant at police headquarters, the key had disappeared. Officers later found it hidden under the cushion of the chair in which the defendant had been sitting. The defendant explained that he collected keys and had found the key at the Ridgemont Apartments. He denied knowing anything about Thomas's disappearance and claimed that he had hidden the key after having "second thoughts" about it. The police released the defendant because at that time they had not found the victim's body and were not certain a homicide actually had occurred.

On October 21, the police discovered Thomas's body in a grassy, overgrown area in the Garden Walk Apartment complex. The victim had no wallet, identification, keys, money or contraband on his body. On October 22, Thomas's automobile, which a patrol officer previously had noticed abandoned on a dead end street in North Memphis, was towed to police headquarters. The vehicle's license plates had been removed, and its VIN numbered covered. Blood was discovered on the handle of the driver's door. The ignition key police officers had seized from the defendant fit the victim's car. The defendant's fingerprint was found on a piece of paper inside the car.

After obtaining additional information from Wells, the police resumed searching for the defendant. On October 23 the defendant called the police and set up a time to surrender, but he failed to show up at the agreed time. Finally, on October 25, eight days after the murder, patrol officers arrested the defendant, who gave a statement. Although the defendant admitted he had killed Thomas, the defendant claimed that he had shot Thomas because Thomas had charged him and threatened to hurt him. The defendant said that Thomas had been four or five feet away when shot. The defendant also claimed that he had needed the money Thomas owed him to support himself and his pregnant girlfriend. Although the defendant told the police that the gun they had taken from Carlos Williams was the gun he had used to shoot Thomas, tests revealed that it was not. The murder weapon was never found.

Dr. Craig Thomas Mallak, the forensic pathologist who had performed the autopsy on the victim's body, and Dr. Steven A. Symes, a forensic

anthropologist who had reconstructed and examined the victim's skull, testified for the prosecution. Dr. Mallak explained that the victim had been shot twice in the head. According to Dr. Mallak and Dr. Symes, the victim was shot first above his left eye and next behind his left ear. Based on the damage to the victim's skull and brain, Dr. Mallak testified that both wounds could have been contact wounds, inflicted from extremely close range. Dr. Mallak opined that the wound behind the victim's ear definitely had been a contact wound, inflicted when the gun was less than one inch from the victim's head. Although Dr. Mallak was unable to determine conclusively whether the first wound also had been a contact wound, he opined that either wound would have been sufficient to cause the victim's death and to incapacitate the victim immediately. Dr. Mallak testified that the gunshots caused "complete destruction of the skull." Both Dr. Mallak and Dr. Symes opined that the wounds were consistent with injuries typical of a large caliber weapon such as a .44 caliber handgun.

The defendant presented no proof at the guilt phase of the trial. The jury found the defendant guilty of premeditated first degree murder.

### B. Sentencing Phase

At the sentencing phase of the trial, the Shelby County Criminal Court Clerk testified that the defendant had pleaded guilty in February 1997 to robbery, kidnapping, reckless endangerment, and attempted rape and had received an effective sentence of three years confinement in the Shelby County workhouse. The defendant committed these offenses at age fifteen. In order to prove these four prior convictions, a fingerprint technician with the Shelby County Sheriff's Department obtained the defendant's right thumb print in the presence of the jury, compared this print with the print associated with the booking number for the four prior convictions, and then testified that the defendant's thumb print matched the print associated with the booking number for the four prior convictions.

All of the defendant's prior convictions stemmed from a single criminal episode that occurred in 1995. Darrell Webster, the victim of the defendant's prior criminal activity, testified for the prosecution. Webster recalled that during the early morning hours of November 18, 1995, as he was leaving an adult bookstore, the defendant and another man accosted him at gunpoint and ordered him to get into the victim's car. After pleading with the two men, Webster thought he had convinced them not to harm him; however, eventually

Webster came to believe the two men intended to kill him. The defendant held a gun on Webster as the men drove around Memphis. The defendant remarked to Webster, who was crying, "Do you want to go out like a punk? Go out like a man." After spinning the barrel of the gun, the defendant placed the weapon against the back of Webster's head and pulled the trigger. The gun did not fire. Next, the defendant placed the barrel of the gun against Webster's head, directly behind Webster's ear, and again pulled the trigger. Again the gun did not fire. Webster recalled the defendant describing his actions as "Russian Roulette." Next, after accusing Webster of being a homosexual, the defendant forced Webster to climb into the back seat and to perform oral sex on the defendant. Thereafter, the defendant and his accomplice discussed how to kill Webster and where to dump his body. By promising to rent a car for the two men, Webster finally convinced the defendant's accomplice to drive to the Memphis airport. When the vehicle slowed to get a ticket for parking, Webster escaped and ran to a nearby airport security officer, who arrested the defendant and his accomplice, thus ending Webster's five-hour ordeal.

The final witness for the State was victim-impact witness Marcie Turcios, the victim's half-sister. Turcios testified that the victim had been a very special, generous, giving person who helped others every way he could. She explained that his death had seriously affected both her and her brother's mother. Turcios explained that Thomas's death had left a void in her life, that she had missed work because she could not sleep, and that she regretted that her seven-year-old son would never have an opportunity to know his uncle.

The defendant's father and mother testified in mitigation for the defense. The family had moved to Memphis from Ashland, Mississippi, about thirteen years earlier. In the ensuing thirteen-year period, the family had bought and sold five houses before returning to Olive Branch, Mississippi. The defendant's grades began falling after the family came to Memphis. The defendant's father had worked twelve to thirteen hours per day as the finance director for an automobile dealership. The defendant's parents had been married for twenty-five years and described themselves as Christian people. The second of three children, the defendant had regularly attended church with his family until he left home in 1996 because he refused to follow family rules. The defendant was fifteen years old when he committed the offenses against Darrell Webster. The defendant's parents confirmed that the defendant loved his fourteen-month-old daughter, whom they were raising. The defendant's mother and father pleaded with the jury to spare their son's life and expressed sorrow for the victim's death. The defendant's father assured the jury that the

defendant was very sorry for what had happened.

The defendant testified in his own behalf. Although he acknowledged killing the victim by shooting him twice in the head, the defendant commented that "half of the things" the State's witnesses had said about the crime were lies. The defendant expressed his remorse, maintained that he did not mean to do what he had done, acknowledged that he had done wrong and that he, not the victim, had been the "bad person," pleaded for mercy, and asked the jury not to kill him.

Upon finding that the prosecution had proven the (i)(2) aggravating circumstance beyond a reasonable doubt and that this aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death.

Cole, 155 S.W.3d at 891-96.

Following the filing of the supreme court's opinion affirming the Petitioner's conviction and sentence, the Petitioner filed a timely petition for post-conviction relief. The post-conviction evidentiary hearing was conducted between October 29 and November 2, 2007, during which the Petitioner introduced a significant amount of evidence that will be discussed later in this opinion. At the conclusion of the hearing, the post-conviction court found that counsel performed deficiently in failing to present an adequate mitigation defense. However, the post-conviction court further found that the Petitioner was not prejudiced by counsel's deficient performance.

## II. Standard of Review for Post-Conviction Cases

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The burden in a post-conviction proceeding is on the petitioner to prove the factual allegation to support his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); See Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Wallace v. State, 121 S.W.3d 652, 656 (Tenn. 2003) (citing Nichols v. State, 90 S.W.3d 576, 586

(Tenn. 2002)). This court may not reweigh or reevaluate the evidence or substitute its inference for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. Id. (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)). It is, therefore, the burden of the petitioner to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

Notwithstanding, "[d]eterminations of whether counsel provided a defendant constitutionally deficient assistance present mixed questions of law and fact." Wallace, 121 S.W.3d at 656 (citing Nichols, 90 S.W.3d at 586). As such, the findings of fact are reviewed under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

### III. Ineffective Assistance of Counsel

The Sixth Amendment provides, in pertinent part that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. CONST. AMEND. VI. This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the states by the Fourteenth Amendment." Gideon v. Wainwright, 372 U.S. 335, 340 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980); McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970); see also Strickland v. Washington, 466 U.S. 668, 686 (1984).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686; Combs v. Coyle, 205 F.3d 269, 277 (6th Cir. 2000). A two-prong test directs a court's evaluation of a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced

the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687; see also Combs, 205 F.3d at 277.

The performance prong of the Strickland test requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or was "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690; see also Kimmelman v. Morrison, 477 U.S. 365, 386 (1986). "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Combs, 205 F.3d at 278. Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged actions 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, it is acknowledged that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 665 (1984)). Notwithstanding, it is the duty of this court to "search for constitutional [deficiencies] with painstaking care" as this responsibility is "never more exacting than it is in a capital case." Id. at 785.

### A. Alleged jury selection errors

#### 1. Failure to rehabilitate

The Petitioner contends that the jury empaneled in his case was biased because while no jurors were dismissed based on their inability to consider lesser punishments, several potential jurors were dismissed when they stated that they believed they were unable to impose the death penalty. The Petitioner believes that the dismissal of the jurors violated his constitutional right to an impartial jury and that counsel's failure to rehabilitate the death-challenged jurors was ineffective. The State responds that counsel attempted to rehabilitate several jurors and that the Petitioner cannot establish deficient performance or prejudice simply because counsel did not attempt to rehabilitate every juror.

During jury selection, 21 prospective jurors were excused for cause because of their views about the death penalty. Lead counsel only attempted to rehabilitate Juror Askew, Juror Kriger, and Juror Field. Juror Askew stated that under no circumstances could she consider the death penalty. Juror Kriger stated that she could not "sign a paper condemning anyone to death." Juror Field, an attorney, made comments as to her opinion of the Tennessee capital sentencing scheme and stated that she did not believe that she could follow the law. The following 18 other prospective jurors maintained that they could not impose the death penalty:

Juror Coston stated that he could not impose the death penalty and that he had been opposed to the death penalty "all his life."

Juror Fritz stated that he could not impose the death penalty and that he had been opposed to the death penalty for a number of years and that nothing could cause him to waiver from that belief.

Juror Certion stated that he could not sentence another person to death and that his feelings and opinions would prevent him from ever imposing a death sentence.

Juror Gray stated that he could not impose the death penalty and that "[n]o one deserves to die regardless if they take another life."

Juror Harris stated that she could not impose the death penalty and that there were no circumstances that would cause her to alter her belief and permit her to impose a sentence of death.

Juror Adams stated that she could not impose the death penalty and that there were no circumstances that would cause her to alter her belief and permit her to impose a sentence of death.

Juror Hervey stated that she could not impose the death penalty and that she could not impose a sentence of death under any circumstances.

Juror Hunter stated that he could not impose the death penalty and that there were not any circumstances in which he could impose the death penalty.

Juror Aguilar stated that she could not impose the death penalty and that she would not be able to follow the law and sentence the Petitioner to death.

Juror Dotson asked to speak with the court after she had already been sworn in as a juror. She stated that she had been thinking about the possibility of

-11-

imposing the death penalty all morning and that she was not sure if she would be able to vote for a sentence of death. Upon questioning by the trial court, she agreed that she would not be able to return a sentence of death. The trial court excused her as a juror; placed another juror, who was initially seated to be considered as an alternate, in her spot; and allowed counsel for both sides to challenge the entire jury panel.

Juror Clark stated that it was her feeling and belief that she could not impose the death penalty under any circumstances.

Juror Howard stated that he was opposed to the death penalty. He added that he has held an unwaivering opposition to the death penalty. Juror Howard stated that he "couldn't sign my name having anything to do with his death."

Juror Bowden stated that she could not impose a sentence of death under any circumstances.

Juror Edwards stated that she did not believe in the death penalty and could not impose a sentence of death under any circumstances.

Juror Branch stated that she could not impose a sentence of death under any circumstances and that she had a philosophical and religious opposition to the death penalty that she could not set aside.

Juror Kleczka stated that, based upon her religious beliefs, she could not impose a sentence of death and that she did not think she would be able to set her religious beliefs aside in order to follow the law.

Juror Fullilove stated that she would be unable to sign her name to a verdict of death. She stated that her father was a pastor and that she could not set aside her beliefs to sit as a juror in this case.

Juror Breckinridge stated that she would be unable to sign her name to a verdict of death. She stated that her husband had been a pastor for 22 years and that they did not believe in the death penalty.

At the post-conviction hearing, lead counsel, an assistant public defender with the Shelby County Public Defender's Office, testified that she was appointed to represent the Petitioner, who was charged with the October 17, 2000, premeditated murder of Santeife Thomas. Lead counsel testified that she handled the major portion of the guilt phase of the trial and that co-counsel handled the major portion of the penalty phase of the trial. Lead counsel was unable to recall whether she engaged in individualized questioning of every juror during jury selection. Although unable to recall specifics, she stated that potential jurors were probably excused for their inability to consider a sentence other than death. She

-12-

conceded that it was possible that nine jurors were excused for their inability to consider a sentence other than death. She could not recall how many jurors she tried to rehabilitate but stated that she believed that additional attempts to rehabilitate death-challenged jurors were futile. She further stated that "it is rare that you truly rehabilitate anyone."

The post-conviction court found that counsel was not ineffective with regard to jury selection. Additionally, the post-conviction court found that the methods used by the State and the trial court for "death qualifying" jurors did not violate Witherspoon v. Illinois, 391 U.S. 510 (1968). Specifically, the post-conviction court found that counsel questioned "those jurors who equivocated on their ability to impose the death penalty" but that trial counsel did not attempt to rehabilitate those jurors who "were adamant in their opposition to the death penalty and their inability to impose such a punishment." The post-conviction court stated,

> The answers provided by these jurors fell within the range of responses anticipated by Witherspoon and [Wainwright v. Witt, 469 U.S. 412 (1985)]. These were not equivocating jurors who could be rehabilitated; nor, were they jurors who simply discerned throughout the jury process that their stated opposition to the death penalty would relieve them of service. Certainly, there were a couple of jurors, as is typical in many cases, which provided somewhat contrived responses to the prosecutor's questions. However, there is nothing to indicate that counsel's attempted rehabilitation would have prevented their exclusion.

A criminal defendant is guaranteed the right to an impartial jury by both the United States and Tennessee Constitutions. See U.S. CONST. AMEND. VI; Tenn. Const. art. I, § 9. In this regard, parties in both criminal and civil cases are granted "an absolute right to examine prospective jurors" in an effort to determine that they are competent. State v. Kiser, 284 S.W.3d 227, 279 (Tenn. 2009) (quoting Tenn. Code Ann. § 22-3-101). In determining when a prospective juror may be excused for cause because of his or her views on the death penalty, the standard is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Witt, 469 U.S. at 424. A juror whose views on the death penalty prevent him or her from returning a sentence of death is therefore excusable for cause. The Supreme Court further observed that "this standard likewise does not require that a juror's biases be proved with 'unmistakable clarity.'" Id. "However, the trial judge must have the 'definite impression' that a prospective juror could not follow the law." State v. Austin, 87 S.W.3d 447, 473 (Tenn. 2002). Where attempts to rehabilitate a juror who has refused to impose the death penalty would be futile, refusal to engage in such useless efforts rarely constitutes deficient performance under Strickland. See Simon v. Epps, 344 Fed. Appx. 69, 84, 2009 WL 2873912, **15 (5th Cir. 2009).

-13-

The prospective jurors were adamant and unequivocal in their position that they could not return a sentence of death. Efforts in attempting to rehabilitate these jurors would have been futile. Therefore, lead counsel's performance was not deficient. All of the excused jurors indicated that they could not vote for capital punishment under any circumstance. When such affirmations are made, it is proper for the trial court to exclude those prospective jurors for cause. See Morgan v. Illinois, 504 U.S. 719, 728 (1992); Lockhart v. McCree, 476 U.S. 162 (1986) (holding that jurors can be removed for cause if their views on the death penalty would substantially impair their performance as a juror in the sentencing phase of the trial). Moreover, the Petitioner's claim of prejudice is necessarily speculative because the Petitioner has failed to present any testimony as to whether the prospective jurors could have been rehabilitated. See, e.g., State v. Hale, 892 N.E.2d 864, 904 (Ohio 2008).

### 2. Failure to question jurors about range of punishment

The Petitioner contends that counsel was deficient for failing to individually question jurors regarding their ability to consider mitigation and to consider punishments less serious than death. The State responds that the post-conviction court found that counsel questioned the jurors regarding their ability to consider punishments other than death.

In one extended discussion with a potential juror, lead counsel stated,

> As long as you can consider that there are three different things – that there's life, there's life without parole, and there's the death penalty. All right. And you don't even have to consider the death penalty unless you decide that the [S]tate has proven, beyond a reasonable doubt, that there's an aggravator – that it exists – an aggravating circumstance.

Lead counsel also asked another juror if she believed that a sentence of death was the only possible sentence available if the Petitioner were convicted of premeditated murder. The juror stated that she could consider other punishments.

In its order denying relief on this issue, the post-conviction court stated, "[The P]etitioner's trial counsel did question prospective jurors about their ability to consider the entire range of punishment."

Jurors "who will automatically vote for the death penalty" are subject to removal for cause just as jurors who refuse to consider the death penalty. Morgan, 504 U.S. at 729. "Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror." Id.

In this case, on several occasions during jury selection, lead counsel questioned the

-14-

prospective jurors about their ability to consider the entire range of punishment and mitigation evidence. These jurors stated that they could consider the entire range of punishment. Accordingly, we conclude that the record supports the post-conviction court's finding that the Petitioner failed to prove that lead counsel neglected to question the jurors about the entire range of punishment.

### 3. Failure to question jurors who were crime victims

The Petitioner contends that counsel failed to question prospective jurors as to whether they or someone close to them had been the victim of a crime. As a result of counsel's failure to question the jurors, the Petitioner contends that at least three jurors, Carolyn Brown,[1] Catherine Daniels, and Keith Latiolais, who participated in his case had prior experiences that cast doubt on their capacity to be impartial jurors. The State responds that all three of the jurors "indicated that their prior experiences would not affect their ability to serve as fair and impartial jurors." The State further responds that the Petitioner does not allege that counsel had a valid basis to exclude the jurors and that the Petitioner cannot demonstrate that he suffered any prejudice because of counsel's failure to remove the jurors.

During jury selection, Ms. Brown revealed that her older sister had been murdered 30 years ago. Ms. Brown responded affirmatively when she was asked whether she could "judge this case only on the proof" presented at trial. Ms. Daniels revealed that a friend's nephew had recently been murdered. Ms. Daniels said, "No" when asked if the death of her friend's nephew would affect her "ability to be fair and impartial to both sides." Mr. Latiolais stated that he once served as a jury foreman in a criminal trial and that "the trial went somewhat awry." The State interrupted Mr. Latiolais and instructed him to not talk about the details of the previous trial. When asked if the jury was able to reach a verdict in that case, Mr. Latiolais said that they reached a verdict. He also responded affirmatively when he was asked whether he could decide this case based on the evidence, the law, and his common sense.

Ms. Brown and Ms. Daniels did not testify at the post-conviction hearing. However, Mr. Latiolais testified that he had previously served as a jury foreman in a criminal case in Lafayette, Louisiana. He said that the defendant in the previous case represented himself and that the defendant's behavior at trial was "erratic" and "kind of crazy." After that case concluded, Mr. Latiolais and other members of the jury received threatening extortion letters from "associates" of the defendant. The letters stated that if the jurors did not pay $1,000 to

---

[1]The Petitioner's brief refers to Ms. Brown as Carolyn Payton. A review of the record and the signed jury verdict form reveal that a Carolyn P. Brown participated in the trial and that the Petitioner is most likely referring to Ms. Brown.

the defendant's "associates," then they would "be reimbursed with a death sentence." Mr. Latiolais testified that during jury selection, he attempted to inform the State about this experience but was interrupted. Mr. Latiolais said that his prior jury service in Louisiana was unrelated to his service in the Petitioner's case and that the prior jury service did not prevent him from being a fair and impartial juror in the Petitioner's case.

Relative to Ms. Brown and Ms. Daniels, the post-conviction court found that lead counsel "inquire[d] of the jurors as to whether any one of them had something in their past or opinions that would keep them from being an impartial juror." Additionally, the post-conviction court found that lead counsel was not ineffective for failing to ask Ms. Brown and Ms. Daniels "more direct questions" and that the Petitioner failed to show how he was prejudiced by lead counsel's failure.

Relative to Mr. Latiolais, the post-conviction court found that lead counsel was not ineffective for failing to question Mr. Latiolais about his prior jury service. The post-conviction court stated that the jurors were asked whether they could be fair and that Mr. Latiolais did not indicate that he would be unable to render an impartial verdict. The post-conviction court found that the Petitioner failed to show how he was prejudiced "by trial counsel's inaction."

The Petitioner cites United States v. Haynes, 398 F.2d 980 (2d Cir. 1968) and Hyatt v. State, 430 S.W.2d 129 (Tenn. 1967) in support of his assertion that we should presume that these jurors were biased against the Petitioner because of their prior experiences. However, we believe that Haynes does not stand for that proposition and that Hyatt is distinguishable based on the facts presented in that case. In Haynes, the court concluded that jurors who had previously served in other trials were not presumptively biased in a subsequent trial in which the same witnesses testified. Haynes, 398 F.2d at 985-86. In Hyatt, the court concluded that a juror who had participated in an earlier case against the defendant was biased. Hyatt, 430 S.W.2d at 130. The defendant in Hyatt was convicted of transporting whiskey, and the juror, who suspected that the defendant was supplying his son with whiskey, "procured a search warrant" five years before the present case was initiated against the defendant in hopes of removing the defendant from the area. Id. Despite the juror's assertion that his past experience with the defendant did not influence his decision to convict the defendant, the court concluded that the "record supports a finding [that] Juror Johnson was at least hostile to the defendant Ollie Catt." Id. The court also stated, "Where the jury or juror has prejudged the case . . . the courts say it must be presumed that his prejudices enter into and become a part of the result." Id.

"The ultimate goal of voir dire is to [e]nsure that jurors are competent, unbiased, and impartial." State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994) (citing State v. Howell, 868

S.W.2d 238, 247 (Tenn. 1993)). In the present case, Mr. Brown, Ms. Daniels, and Mr. Latiolais did not have any prior experiences with this particular Petitioner or with a similarly situated defendant. The State questioned all of the jurors as to their ability to disregard their personal experiences and to follow the law. These jurors stated during jury selection that their previous experiences would not impact their ability to serve on the jury. The Petitioner has offered no evidence to establish that the jury ultimately empaneled was biased or unfair. Accordingly, we conclude that the Petitioner has not established that trial counsel was ineffective for failing to further question these jurors.

### 4. Improper questioning of prospective jurors by the State

The Petitioner contends that counsel should have objected to the State's line of questioning regarding whether they could sentence the Petitioner to death. The Petitioner further contends that the State's questioning was improper and went far beyond a general inquiry regarding the death penalty because the State essentially asked potential jurors to discount the Petitioner's youth – a potential mitigating factor in the case. The State responds that counsel did not have a reasonable basis to object to the State's inquiry because the line of questioning was "proper and necessary." The State asserts that if the jury were to find the Petitioner guilty and sentence him to death, the jurors would then be required to sign their names on a verdict form reflecting their decision.

The Petitioner also contends in this section of his brief, in a footnote, that he was "prejudiced by counsel's failure to seek and the court's failure to order sequestration" of the jury in his case prior to the start of the trial. This allegation was raised in the petition for post-conviction relief but was not sufficiently analyzed or supported with argument or citations in the appellate brief. See Tenn. Ct. Crim. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Additionally, from our review of the record, we do not believe that the record suggests that the Petitioner was prejudiced by counsel's failure to seek jury sequestration prior to trial. Accordingly, this issue is waived.

At numerous times throughout jury selection, the State asked potential jurors whether they would be able to sign a verdict form sentencing the Petitioner to death. At times, the State referred to the Petitioner by name. Other times, the State simply asked if the jurors could sign a verdict form sentencing anyone to death.

In denying relief on this issue, the post-conviction court stated that it found "counsel's assertion that the prosecutor asked questions 'calculated' to lead potential jurors to express opposition to the death penalty to be completely without merit." In concluding that the State's questioning was proper, the post-conviction court further stated,

Each member of a capital sentencing jury is required by law to sign their name

to a verdict of death. Thus, the prosecutor was merely attempting to explain the full range of responsibilities associated with sitting on a capital jury and inquiring as to whether the jurors would be able to follow the law.

Pursuant to Tennessee Code Annotated section 39-13-204(g)(1), upon finding that the statutory aggravating circumstances outweighed any mitigating circumstances, the jury would be required to sentence a defendant to death. The sentence of death, which would contain the defendant's name, would then have to be signed by each member of the jury. Tenn. Code Ann. § 39-23-204(g)(2)(B).

In this case, the prospective jurors were asked if they could follow the law and sentence the Petitioner to death if required. The Petitioner's contention that such questioning would serve to indoctrinate the jury and prohibit them from considering the Petitioner's youth as a mitigating circumstance is without merit. In order to return a sentence of death, the jury would have to consider any potential mitigating circumstances. Accordingly, we conclude that the State's questioning of the jury was proper. Therefore, we cannot conclude that lead counsel was ineffective for failing to object to the phrasing of the State's inquiry.

## B. Alleged Guilt Phase Deficiencies

The Petitioner contends that counsel failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions in the guilt phase of his trial and that counsel's ineffectiveness prejudiced the Petitioner's defense. The State responds that counsel was effective and that even if counsel were ineffective, the Petitioner cannot demonstrate that he was prejudiced by counsel's alleged deficiencies.

### 1. Guilty plea

The Petitioner contends that counsel was ineffective for failing to negotiate a guilty plea earlier in the case and that counsel should have advised the Petitioner to plead guilty in order to avoid a sentence of death. The Petitioner further contends that had counsel properly investigated the case, counsel could have convinced the State to withdraw its death notice because of the "significant legal and factual problems related to the sole aggravator." Accordingly, the Petitioner asserts that removing the possibility of a death sentence "would have created a new ceiling on the sentence and a new range of acceptable pleas," thus possibly allowing the Petitioner to plead guilty to a lesser offense. The State responds that counsel discussed the possibility of accepting a plea agreement with the Petitioner after the State filed its notice to seek the death penalty; that they renewed plea negotiations when unfavorable testimony was presented at trial; and that the Petitioner refused to accept a plea agreement.

At the post-conviction evidentiary hearing, lead counsel stated that it was her practice to speak with her clients "after indictment and after the death [notice] is filed" as to whether or not they would consider accepting a plea agreement. She stated that the Petitioner was not interested in entering a plea to life imprisonment. She also stated that plea negotiations were renewed during the trial when Mr. Wells testified that the Petitioner returned to the scene of the crime on two or three occasions. When presented with the idea of pleading guilty and receiving a sentence of life imprisonment without parole, the Petitioner rejected the plea.

The post-conviction court found that the record did not support the Petitioner's claim. Specifically, the post-conviction court found that "both [attorneys] as well as petitioner's parents were trying to assist [the] petitioner in making a decision regarding a possible guilty plea." The post-conviction court stated that the "trial judge cleared the courtroom and gave the [P]etitioner's family a chance to meet [with the Petitioner]."

The record supports the findings of the post-conviction court. Lead counsel testified that she discussed the possibility of accepting a plea agreement with the Petitioner before and after the trial had started. The record also indicates that the Petitioner was given a chance to discuss the possibility of accepting a plea agreement in the middle of the trial. Accordingly, we conclude that the Petitioner has failed to prove his factual allegations to support his grounds for relief by clear and convincing evidence.

## 2. Trial

### a. Self-defense theory

The Petitioner contends that counsel was ineffective for failing to pursue a theory of self-defense when the evidence supported the Petitioner's assertion that he killed the victim in the midst of a struggle. The Petitioner concedes that the initial autopsy report belied a theory of self-defense but asserts that the subsequent autopsy report would have supported his theory if counsel had hired a pathologist to testify on his behalf. Additionally, the Petitioner asserts that evidence of the victim's cocaine use that night would have supported his theory. The State responds that there was insufficient proof to support a theory of self-defense and that counsel's decision to reject the theory of self-defense was supported by the record because the Petitioner was the initial aggressor.

At the Petitioner's trial, Andropolis Wells testified that he heard the Petitioner repeatedly tell the victim to open his mouth and that the victim told the Petitioner to stop playing. Mr. Wells also testified that he saw the Petitioner pointing a gun at the victim's face. A short time later, Mr. Wells heard two gunshots. Robert Eric Adams testified that the Petitioner told him that he killed the victim because the victim owed him fifteen dollars and was not going to pay him until Friday. Mr. Adams also testified that the Petitioner stated that

he believed that the victim was lying and that he "asked him the same question three times" before shooting the victim "upside the head." He said that the Petitioner told him that the victim "fell back" before he shot him a second time in the face.

Dr. Craig Mallak testified at the Petitioner's trial that he tested the victim's bodily fluids and found "cocaine and a breakdown product" in the victim's urine. He said that he initially thought that the victim was shot twice behind the left ear but that after the forensic anthropologist reconstructed the victim's skull, they determined that the victim had been shot above the left eye and behind the left ear. He was unable to determine whether the wound above the left eye was a contact wound because based upon his erroneous belief that this wound was simply a laceration, he did not "collect the skin from around that area." He stated that the area of damage above the left eye was consistent with a contact wound but was unable to state with any certainty as to whether that wound was actually a contact wound. He stated that the second wound was a contact wound and that the gun "could have been up to an inch away" from the head when the second wound was inflicted. He believed that the wound above the left eye was inflicted first but stated that either shot would have caused the victim's death. He said that the victim would have been "immediately incapacitated" upon the infliction of the first gunshot wound.

On cross-examination, Dr. Mallak admitted that if the victim were standing when the first wound was inflicted, the victim would have fallen after the infliction of the first gunshot wound. Dr. Mallak also reiterated that in addition to the cocaine byproduct found in the victim's bodily fluids, cocaine was also found in the victim's bodily fluids. On re-direct examination, Dr. Mallak stated that the victim would have collapsed when the first gunshot wound was inflicted but that if the victim were in "midstride" when the first wound was inflicted, the victim "might" be able to take a step "before he collapsed."

The Petitioner's confession was also introduced to the jury, in which the Petitioner made the following statements:

> The reason why I murdered [the victim] really wasn't about the money. He charged at me as if he was trying to attack me and hurt me. Instead of me defending myself with my fist, I pulled the gun out, and I used it on him.

Cole, 155 S.W.3d at 894, n. 3.

At trial, lead counsel only requested a self-defense instruction when she was prompted by the trial court before closing argument. During closing argument at trial, lead counsel

-20-

argued that the State had failed to prove premeditation but did not argue that the Petitioner killed the victim in self-defense.

At the post-conviction hearing, lead counsel testified that she attempted to show that the murder was not premeditated. She stated that there were facts present that lessened the proof of premeditation. She remembered that the Petitioner told the police that "When I shot him the first time he was coming towards me. When I shot him the second time he was still coming towards me." However, she believed that there was a forensic problem with the Petitioner's version of the events. She explained that based upon her investigation, the victim would have been unable to continue his approach toward the Petitioner after he was shot in the head. She conceded that momentum could explain an additional step after the initial shot. Despite her disbelief of the theory, she testified that she requested an instruction on self-defense even though she initially told the trial court that she did not want a self-defense instruction.

Lead counsel did not recall receiving a statement from Marcus Puryear during discovery. However, Mr. Puryear testified at trial that he heard two gunshots at the time of the incident. Lead counsel stated that Mr. Puryear was not in a position to observe whether there was a struggle before the shooting and that Mr. Wells was the only eyewitness to the shooting.

Lead counsel admitted that she did not ask Dr. Mallak about the effects of cocaine relative to the victim's ingestion of cocaine on the night of the murder. She testified that she attempted to introduce the victim's prior drug convictions in order to show that the victim was killed during a drug deal. However, the victim's prior convictions were not allowed into evidence.

Ralph J. Nally, chief investigator of the Shelby County Public Defender's Office, testified that he visited the crime scene on several occasions and that he also interviewed Marcus Puryear on April 23, 2001. He stated that Mr. Puryear witnessed two men running from the scene of the incident and that Mr. Puryear provided law enforcement officers with a license plate number. He testified that he also attempted to interview Mr. Wells, who was 15 years old at the time of the offense, but stated that he was unable to speak with him prior to trial. He explained that Mr. Wells's mother would not allow him to speak with her son without her being present.

Dr. Gregory Davis, a professor of pathology at the University of Kentucky and state medical examiner in Kentucky, testified at the post-conviction hearing as an expert in the field of forensic pathology. Dr. Davis stated that he was retained by the Petitioner for purposes of reviewing the autopsy reports in preparation for the post-conviction evidentiary

-21-

hearing. Dr. Davis explained that a drug screen of the victim's urine revealed that cocaine and a cocaine byproduct were present. The presence of cocaine, the parent compound, "indicates that the [victim] probably had used cocaine within a couple of hours before death." He stated that "individuals who take cocaine experience what is colloquially referred to as a high" and that they may feel "very energetic, very boisterous." He stated that cocaine may affect people in different ways. For those people who are "very laid back and mellow," cocaine will "make them a little less so." For those people who have "an aggressive personality," cocaine will "make them even more" aggressive.

Dr. Davis testified that Dr. Symes had determined that the gunshot wound to the frontal area occurred first followed by the wound behind the ear. Dr. Davis confirmed that this conclusion was consistent with his examination of the evidence. Dr. Davis also reviewed Dr. Mallak's findings and concluded that Dr. Mallak's initial finding that there was only one gunshot wound entrance was erroneous. Dr. Davis agreed with the revised autopsy report that there was a gunshot wound to the victim's forehead and a gunshot wound behind the victim's ear. However, Dr. Davis testified that Dr. Mallak, in his revised autopsy report, indicated that the gunshot wound to the forehead was also a contact wound. Dr. Davis stated that "[t]here is no physical evidence" to support the assertion that the wound to the forehead was a contact wound. He stated that there was no indication that any subcutaneous soot was present in the first wound. He confirmed that the second wound, behind the ear, revealed the presence of subcutaneous soot. Thus, the wound behind the left ear was either a contact wound or a near contact wound.

Reviewing the wounds, Dr. Davis said the Petitioner's version of events was supported by the forensic proof – the victim was still approaching the Petitioner after the first shot. However, the State's version of events was also supported by the forensic proof – the victim fell backwards after the first shot, and the Petitioner walked over to the victim and shot him behind the ear. Dr. Davis also stated that the victim could have been moving backwards at the time of the first shot and that the victim would have fallen backwards immediately. Dr. Davis stated that "[t]here is absolutely no way a forensic pathologist could say, with reasonable certainty, that one over the other took place." Dr. Davis admitted that if the two gunshots occurred in rapid succession, then it was more probable that the victim was coming toward the Petitioner.

The post-conviction court found that "even if counsel were ineffective in failing to solicit the aid of a forensic expert to assist them in challenging the testimony of the [S]tate's experts, [the P]etitioner . . . failed to demonstrate that he was prejudiced by counsel's inaction." The post-conviction court found that both the Petitioner and the State's theories were supported by the evidence at trial. Specifically, the court stated,

> [E]ven if the jury heard that the forensic proof supported both the [S]tate and the [P]etitioner's version of events, they would still likely have found that the [S]tate's theory was more fully supported by the proof.

Relative to trial counsel's failure to present to the jury the effects of cocaine on the victim on the night of the shooting, the post-conviction court stated,

> Trial counsel did in fact elicit testimony demonstrating the victim had used cocaine and that, in fact, the victim's toxicology screen showed both byproducts from past use and chemical components of more recent use.

The post-conviction court found that any proof regarding the victim's drug use would only have been "marginally beneficial" because "Dr. Davis clearly indicated that the type and degree of effect the drug would have on an individual depends upon that individual's personality traits." The post-conviction court further found that even if trial counsel was ineffective for failing to elicit this testimony, the Petitioner "failed to demonstrate [that] he was prejudiced by counsel's inaction."

In order to prevail with a theory of self-defense, lead counsel would have had to prove that the Petitioner had a "reasonable belief that there [wa]s an imminent danger of death or serious bodily injury" and that the Petitioner believed that his use of force was "immediately necessary to protect" himself from the victim's "attempted use of unlawful force." See Tenn. Code Ann. § 39-11-611(a). Lead counsel would also have had to prove that the Petitioner's belief of imminent death or serious bodily injury was "real, or honestly believed to be real at the time" and "founded upon reasonable grounds." See Tenn. Code Ann. § 39-11-611.

While we agree with the Petitioner that lead counsel could have attempted to pursue a theory of self-defense, the testimony presented at trial established that the Petitioner provoked the victim. See Tenn. Code Ann. § 39-11-611(d). Mr. Wells testified that the victim was unarmed and that the Petitioner pointed the gun at the victim and told the victim to open his mouth. Thus, while the victim may have charged at the Petitioner, the victim was unarmed. Additionally, testimony provided by Mr. Adams at trial negated a theory of self-defense when Mr. Adams testified that the Defendant said that he killed the victim because the victim owed him money. Accordingly, we conclude that trial counsel's decision to forego a theory of self-defense and attempt to prove that the Petitioner acted without premeditation was supported by the evidence and based on sound trial strategy.

### b. Cross-examination of the State's witnesses.

The Petitioner contends that because counsel failed to investigate his theory of self-defense, counsel was unable to effectively cross-examine the State's witnesses, Mr. Wells and Mr. Adams. The State responds that the post-conviction court properly denied relief on these grounds.

### i. Andropolis Wells

-23-

The Petitioner contends that lead counsel's performance was ineffective regarding the cross-examination of Mr. Wells. Specifically, the Petitioner cites to three omissions of counsel: (1) the failure to cross-examine Mr. Wells as to the fact that this statement was inconsistent with the forensic evidence; (2) the failure to explore Mr. Wells's motive to shift as much of the blame as possible to the Petitioner; and (3) the failure to impeach Mr. Wells about his obvious difficulty in actually seeing the events leading up to the shooting. The State responds that trial counsel sufficiently impeached Mr. Wells's testimony and that the post-conviction court properly concluded that the cross-examination of the witness was effective.

In the post-conviction court's order denying relief, the post-conviction court found that trial counsel "asserted that the forensic proof did not support [Mr. Wells's] initial statement to [the] police." The court found that trial counsel cross-examined Mr. Wells regarding his limited ability to observe the shooting and the "inconsistencies between his trial testimony and his statement to police." The post-conviction did not enter findings relative to Mr. Wells's potential criminal liability in the case because he was present when the Petitioner killed the victim; however, the post-conviction court categorically stated that trial counsel was not ineffective in her cross-examination of Mr. Wells.

Trial counsel questioned Mr. Wells regarding the timing of the two gunshots and his ability to view the shooting. During direct examination and cross-examination of Mr. Wells, Mr. Wells stated that he did not see the Petitioner kill the victim and that he did not move to get a better view after he heard the first gunshot. On cross-examination, lead counsel attempted to undermine Mr. Wells's credibility by impeaching him with his initial statement to police. As a result, Mr. Wells admitted that he initially told the police that he observed the Petitioner standing over the victim before he fired the second shot. Subsequently, on re-direct examination, Mr. Wells was able to read the entirety of his statement into evidence. Accordingly, we acknowledge that lead counsel cross-examined Mr. Wells on these issues. While lead counsel would have been wise to avoid using Mr. Wells's damaging statement in her cross-examination, we cannot say that her cross-examination of the witness was deficient because we will not second-guess sound trial strategy. Relative to the Petitioner's contention that lead counsel neglected to cross-examine Mr. Wells regarding his potential criminal liability in the shooting, we conclude that the Petitioner has failed to show how trial counsel's decision to forego this line of inquiry prejudiced his case when the proof at trial was compelling.

ii. Robert Eric Adams

The Petitioner contends that counsel failed to contact Mr. Adams prior to trial and that counsel was ineffective in her cross-examination of Mr. Adams because she failed to properly impeach his credibility. The Petitioner asserts that Mr. Adams discussed the

Petitioner's post-offense conduct only after Mr. Adams was told that he could be criminally liable as an accessory after the fact for accompanying the Petitioner on a return trip to the crime scene. The State responds that counsel was effective in her cross-examination of Mr. Adams because Mr. Adams admitted that he did not initiate contact with the police and that he did not tell the police where the victim's body was until his third interview with police officers.

At trial, Mr. Adams testified that he only spoke to police after he was taken to the police station and questioned. He stated that he was taken to the police station on three different occasions, and that on the third day, he told the police that he knew where the body was located. On direct examination, he said that when the police picked him up on the third day, they told him that "they [were] coming to pick [him] up on a murder charge." He stated that he "told them everything" because he was "tired of them coming and picking [him] up" when he "knew what was going on." On cross-examination, lead counsel did not ask Mr. Adams questions regarding his decision to tell the police where the body was located. However, lead counsel asked Mr. Adams about the raid at the apartment complex where Carlos Williams was arrested the day before Mr. Adams was arrested. Lead counsel also asked Mr. Adams about the day that he was taken to the police station. Mr. Adams stated that he was riding in the car with his friend when the police stopped them. He did not know why his friend was stopped by the police.

The Petitioner did not argue in his petition for post-conviction relief that trial counsel was ineffective for failing to cross-examine Mr. Adams about his potential criminal liability in the case. In the petition and at the post-conviction hearing, the Petitioner contended that trial counsel was ineffective for failing to argue that Mr. Adams's recollection of the struggle between the Petitioner and the victim was contrary to the forensic proof presented at trial. The post-conviction court entered findings regarding the forensic proof and did not discuss Mr. Adams's credibility. Accordingly, we conclude that the Petitioner has waived the issue of whether trial counsel should have questioned Mr. Adams about his potential criminal liability. However, we believe that trial counsel was not deficient for failing to question Mr. Adams about his potential criminal liability because the jury heard the testimony about Mr. Adams's involvement with the police and his continued interrogations.

In its order denying relief, the post-conviction court found that lead counsel argued that the forensic proof supported the Petitioner's assertions and that lead counsel also argued that Mr. Adams's testimony did not support the forensic evidence. Following our review, we also conclude that lead counsel was not deficient for failing to further cross-examine Mr. Adams as to the circumstances of the offense. Moreover, as Mr. Adams had no direct knowledge as to the specifics of the shooting, it was not deficient performance for lead counsel to fail to extensively question Mr. Adams regarding the forensic proof.

## c. Closing argument

The Petitioner contends that counsel was ineffective because her statements in closing argument were inconsistent with the testimony presented at trial. The Petitioner asserts that during closing argument in the guilt phase of the trial, lead counsel stated that the Petitioner told Mr. Wells that he intended to kill the victim. The Petitioner contends that lead counsel misstated the evidence and that her misstatement of the evidence prejudiced the Petitioner when he was attempting to assert a theory of self-defense at trial. The State concedes that lead counsel's statement was not supported by Mr. Wells's testimony but asserts that the Petitioner cannot prove that lead counsel's statement affected the outcome of the trial. In this regard, the State cites to (1) the fact that the jury was properly instructed that counsel's statements are not evidence and that the jurors are the sole judges of the facts, (2) the fact that the jury was properly instructed on the element of premeditation, and (3) the fact that even without lead counsel's comment, there was more than sufficient evidence of premeditation.

At trial, no witness testified that the Petitioner had stated his plans to kill the victim. However, during closing argument, lead counsel made the following statement:

> You then heard [Mr. Wells] come in and say that [the Petitoner] said, "Let's take [the victim] over here because I'm going to kill him." And [Mr. Wells], was he really that believable about anything? He had to be led through his whole testimony. The [S]tate asked him basically yes and no questions. When he couldn't figure out what to say, they led him. That's not unusual. A lot of times that's what happens with juveniles. But the testimony he gave from that chair, parts of it were different from the testimony - or from the testimony he gave to the police.

At the post-conviction hearing, when confronted with the erroneous statement contained in her closing argument, lead counsel said, "I guess I thought that [Mr. Wells] had said that in his testimony." The post-conviction court's order does not contain any references to this allegation of ineffective assistance of counsel. This issue was raised in the petition for post-conviction relief, argued at the post-conviction hearing, and raised again in the Petitioner's brief on appeal.

Pursuant to Tennessee Code Annotated section 40-30-111(b), the post-conviction court is required to enter a final order that sets forth "all grounds presented" and states "the findings of fact and conclusions of law with regard to each ground." Ordinarily, the court's failure to enter findings of fact and conclusions of law in its written order would be considered harmless error if the court rendered extensive findings in its oral pronouncement of the denial of post-conviction relief. See State v. Higgins, 729 S.W.2d 288, 290-91 (Tenn. Crim. App. 1987). However, in this case, the court did not enter any findings on the record, written or oral, as to whether counsel was deficient for misstating the evidence in her closing

-26-

argument. Thus, remanding the case for the post-conviction court to enter findings of fact and conclusions of law would ordinarily be appropriate. However, remand is unnecessary in this case because we are able to review the transcript of trial counsel's closing argument and consider it with the proof presented at trial. See State v. Binette, 33 S.W.3d 215, 219 (Tenn. 2000) (stating that an appellate court may review evidence for itself when credibility is not at issue).

Closing argument must be "temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976). While lead counsel was attempting to attack the credibility of a witness, lead counsel misstated the testimony presented at trial. Additionally, this section of her closing argument was not based on sound trial strategy and was not within the "wide range of professionally competent assistance." Strickland, 466 U.S. at 690. We agree with the State that the argument of counsel is not evidence, but we also believe that lead counsel's statements undermined the Petitioner's theory of defense and suggested to the jury that there was testimony indicating that the Petitioner premeditated the murder. Such an error amounts to deficient representation. However, we cannot conclude that these statements deprived the Petitioner of a fair trial when both this court and our supreme court concluded that the evidence of premeditation in this case was overwhelming. See Cole, 155 S.W.3d at 898. Indeed, we also believe that the evidence of premeditation in this case was sufficient when the Petitioner was seen pointing a gun at the victim's face and telling him to open his mouth before he shot the victim. Accordingly, we conclude that the Petitioner has failed to prove that there is a reasonable probability that the result of the guilt phase of his trial would have been different had lead counsel not made this erroneous statement.

### C. Alleged Penalty Phase Deficiencies

The Petitioner contends that counsel failed to effectively assist him at the penalty phase of his trial as guaranteed by both the Tennessee and United States Constitutions. The Petitioner argues that counsel failed to investigate mitigation evidence and failed to investigate the underlying facts related to the aggravating circumstance presented in his case. Additionally, the Petitioner argues that the post-conviction court erroneously concluded that the Petitioner was not prejudiced by counsel's errors. The State responds that the Petitioner cannot establish that he was prejudiced by counsel's errors.

#### 1. Failure to investigate and present mitigation evidence

Relative to his argument that counsel failed to uncover mitigation evidence, the Petitioner specifically contends that counsel: (1) failed to obtain juvenile records describing the physical abuse the Petitioner suffered as a child; (2) failed to present evidence of spousal

abuse of his mother by his father; (3) failed to present evidence of family discord and marital infidelities in the Cole household; (4) failed to present evidence of the use of illegal drugs by the Petitioner's parents; (5) failed to present evidence of the Petitioner's running away from home without meaningful parental intervention; (6) failed to present evidence of the Petitioner's "homelessness" and life circumstances in the months preceding the homicide; (7) failed to present evidence of the Petitioner's cognitive and educational limitations and brain dysfunction; (8) failed to present evidence regarding the Petitioner's post-traumatic stress disorder and depression; and (9) failed to present scientific evidence related to the Petitioner's youth and cognitive development at the time of his offenses. The State does not contest the post-conviction court's finding that counsel was deficient for failing to investigate the mitigating evidence but responds that the Petitioner cannot rely upon the newly submitted mitigation evidence to support his claim that he was prejudiced by counsel's deficiency. The State responds that the documents reflect that the Petitioner suffered abuse from his mother, not from his father and that the evidence cannot support a finding of prejudice when the documents catalogue the Petitioner's repeated criminal involvement during the period of abuse. The State urges this court to compare the Petitioner's case with the case of Wiggins v. Smith, 539 U.S. 510 (2003).

During the penalty phase of the Petitioner's trial, the mitigation proof presented by the Petitioner's defense team was limited to the presentation of the testimony of the Petitioner and the Petitioner's father and mother. The Petitioner's parents' testimony essentially presented a picture of a stable Christian family. Indeed, at the post-conviction evidentiary hearing, counsel testified that their mitigation theory was to portray the Petitioner's behavior as an aberration from what they perceived to be a middle class home life in which he had been raised.

a. Evidence at the post-conviction hearing

i. Evidence regarding counsel's investigation

At the post-conviction hearing, lead counsel stated that Joyce King, a social investigator and mitigation specialist in the Shelby County Public Defender's Office, acted as the social investigator on the Petitioner's case and was primarily responsible for investigating the penalty phase of the trial.

Relative to the Petitioner's family history, lead counsel testified that approximately one week before trial, the Petitioner's mother, Cathy Cole, informed her that her husband, Roy Cole, had been emotionally abusive toward her through much of their marriage. However, lead counsel recalled that Cathy Cole reported that the alleged abuse was not physical. Therefore, the defense team did not do any investigation to determine whether Roy

Cole had been arrested for abuse, either in Mississippi or Memphis. She conceded that Roy Cole had, in fact, been arrested as a result of a domestic disturbance call in Memphis.

Relative to the Petitioner's juvenile history and education, lead counsel testified that the Petitioner's juvenile file contained multiple runaway charges, beginning as young as 12 years old. During this same time period, the Petitioner was doing poorly in school, earning C's and F's. He was also absent 36 days and was suspended for "chronic class cutting." The report from November 1995 reflected that the Petitioner "simply refuse[d] to attend class and ha[d] received three board suspensions and five home suspensions this year." Lead counsel conceded that she did not visit any of the Petitioner's schools nor did she interview any of the Petitioner's teachers.

Relative to the Petitioner's cognitive and emotional health, lead counsel stated that a psychological examination of the Petitioner was conducted when he was approximately 15 years old. The report reflected that the Petitioner's intelligence quotient (IQ) was 78. The report further indicated:

> This personality assessment does not indicate serious psychopathology, though there is evidence of feelings of insecurity and inadequacy and he may occasionally display generalized anxiety.

> Also, the protocol reveals an individual who feels alienated from his school and his social environment and it appears that he is especially untrusting of himself in social situations.

> Also, he tends to be excessively sensitive to other people and he may occasionally display suspiciousness. There is no evidence of a thought disturbance.

Lead counsel testified that she did not seek to have any type of neuropsychological or cognitive testing conducted on the Petitioner, nor did she seek to have him examined by a psychiatrist or a psychologist.

Concerning her relationship with the Petitioner, lead counsel testified that she never had a problem communicating with the Petitioner and that there were no "red flags" concerning the Petitioner's mental health. She stated that his learning issues were not significant enough to contribute to his mitigation defense.

Lead counsel acknowledged that the Petitioner's parents were the only witnesses who testified on the Petitioner's behalf at the penalty phase of the trial. She opined that "a parent

-29-

begging for a child's life is one of the most effective weapons you have in sentencing." However, she recalled that the Petitioner's parents, particularly his father, were both quite reserved and failed to make the impact that the defense had anticipated. She stated that there was nothing "grossly abnormal in [the Petitioner's] lifestyle."

Co-counsel testified that he prepared the defense proof for the penalty phase of the trial. He stated that the Petitioner's family was middle class and that he tried to portray the Petitioner's family as a good family. He recalled that he did not notice the tension between the Petitioner's parents until the conclusion of the guilt phase of the trial. He said that immediately following the guilt phase, he noticed that Roy Cole was "overbearing [and] very forceful" He felt that up until this point, Roy Cole had "camouflaged" any abuse in the household. However, he stated that he did not have time to incorporate this revelation into his mitigation strategy. He stated that they made a strategic decision as to which family to portray, the good family or the one with abuse.

Ms. King testified that she participated in the investigation of the Petitioner's case. According to her investigation, the Petitioner lived in Mississippi as a young child with Roy Cole, Cathy Cole, and his two brothers, Jonathan and Cornelius. The family relocated to the Hickory Hill area of Shelby County when the Petitioner was about seven years old.

Ms. King testified that the defense team held an initial meeting with the Petitioner's family members on June 26, 2001. Her notes reflected that the following people attended the meeting: family friend, Casell Randle; maternal grandparents, Bernell and Alma Hoyle; aunts, Charlie McKenzie, Ada Williams, and Janet Christian; girlfriend and mother of his child, Violet Grant; parents, Roy and Cathy Cole; and brother, Johnathan Cole. Ms. King recalled that after this initial meeting, the Petitioner's father, mother, and brother were identified as penalty phase witnesses. Ms. King stated that the Petitioner's family was very supportive of him and that the family told her that the Petitioner was "just a normal boy growing up in Mississippi." Family members indicated that the Petitioner's "trouble started when they relocated to Memphis."

Ms. King stated that the Petitioner provided her with the names of four character witnesses: Sheffield Middle School Basketball Coach Jim Wyatt; Track and Field and Football Coach Maurice McNairy; his godmother, Janice Murphy; and Boy Scout leader and neighbor, Joseph Weiner. Ms. King admitted that she did not contact any of these people. Ms. King recalled that the Petitioner's maternal grandfather, Bernell Hoyle, was a minister. She also learned that the Petitioner's maternal uncle, Jamey Hoyle, suffered from some type of mental illness. She explained that she was never able to speak with Jamey Hoyle and that the attorneys never asked her to obtain Jamey Hoyle's mental health records.

Ms. King testified that through her investigation she learned that Roy and Cathy Cole had marital problems that were not openly discussed. She later learned that Roy Cole was not "around as much as he should have [been]" and that most of the "rearing was left to [] Cathy Cole." She also recalled that at some point the couple may have separated. Ms. King related that the Petitioner told her that his father physically abused his mother when he was a child. However, she stated that the family never verified that the abuse had actually taken place. Ms. King acknowledged that she did not check Roy Cole's criminal record for incidents of domestic violence, nor did the attorneys direct her to do so. When presented with Roy Cole's arrest record for domestic assault, Ms. King acknowledged that Roy Cole had been arrested after police were called to the Memphis home. The report indicated that Cathy Cole told officers that Roy Cole choked her and "pushed [her] to the floor." The report also indicated that officers observed bruising on Cathy Cole's neck. After indicating that she wanted to prosecute, Roy Cole was arrested for "fear of abuse" and "for fear [that the] offense would continue."

Ms. King related that the Petitioner's brother, Cornelius Cole, had a criminal record. She explained that Cornelius Cole's criminal record was from the Juvenile Court in Memphis, Tennessee. She also confirmed that Cornelius Cole had pled guilty in February 1998 to aggravated assault in the State of Mississippi. Ms. King conceded that she did not have a copy of this conviction in her file.

Ms. King testified that the Petitioner attended school in Ashland, Mississippi through the second grade. She said that once the family relocated to Memphis, the Petitioner attended Knight Road Elementary School for third through fifth grade, Goodlett Elementary School for fifth through sixth grade, and Chelsea High School for ninth through twelfth grade. She also indicated that the Petitioner went to "Sheffield School" for the seventh grade and that a report from that school indicated that the Petitioner was failing math, science, English, social studies, and art. He also had a D in music and a C in physical education. Ms. King affirmed that five days prior to trial she requested the Petitioner's records of expulsions or suspensions with the Memphis City Schools. Ms. King stated that she was never directed by counsel to visit any of the schools attended by the Petitioner. However, Ms. King visited Sheffield School but did not interview any of the Petitioner's teachers. She stated that she obtained the records that were requested by the defense team.

Relative to the Petitioner's employment history, Ms. King testified that she sent releases for records to Western Staff Temporary Services, Kevin's Hotwings, The Regional Medical Center, The Med, and Dr. Ron Butch. Ms. King testified that Kevin's Hotwings had no record of the Petitioner's employment. However, Western Staff Temporary Services confirmed that the Petitioner had been employed through their agency as an interim employee at Techni-Color.

-31-

Ms. King testified that the Petitioner's prior arrest history consisted of three or four runaway charges. Ms. King testified that the Petitioner ran away from home in 1995. Reading from a report, she testified:

April 19, 1995, while visiting [the Petitioner] in detention. He advised he left home because he [wa]s tired of his father beating him. Officers did observe old scars on [the Petitioner's] arm. Referral made to the Department of Human Services.

Ms. King attempted to locate the records arising from this referral; however, she did not obtain these records because counsel did not issue a subpoena for them. Ms. King confirmed that the Department of Children's Services reported that they were unable to locate a file on the Petitioner. Ms. King reported that records dealing with sexual abuse are kept indefinitely but that all other records are destroyed five to seven years after the case is closed. Ms. King stated that the Petitioner was arrested in 1995 for aggravated robbery when he was 15 years old and that he was transferred to criminal court.

Ms. King also identified a psychological report from Foreign Adams Psychological Associates, which was conducted pursuant to court order. The assessment report revealed that the Petitioner's verbal IQ score was 78. The assessment report further indicated that the Petitioner had "feelings of insecurity and inadequacies and he may occasionally display generalized anxiety." Ms. King stated that this information was relayed to counsel.

On cross-examination, Ms. King said that no family member indicated any family history of alcohol or drug abuse. However, she also stated that the Petitioner told her that his maternal uncle suffered from some type of mental illness and that his brother had been convicted of a drug offense in Mississippi. She added that the Petitioner informed her that his father physically abused his mother. The Petitioner never indicated that he was abused in any manner.

ii. New mitigation evidence

The Petitioner presented the videotaped deposition testimony of his younger brother, Johnathan Cole. Johnathan Cole stated that although he attended his brother's trial, he never testified because he was never asked to testify. He testified that at the time of trial, their oldest brother, Cornelius, had just been released from Parchman Penitentiary in Mississippi.

Johnathan Cole testified that they lived in Ashland, Mississippi, until 1989 or 1990, when the family moved to Memphis. Their father moved the family to Memphis after he lost the election for supervisor in Benton County, Mississippi. He stated that Roy Cole moved

first to "establish some kind of means of employment and find a house for us" because Roy Cole had "lost everything in the election that took place in Ashland." He stated that the rest of the family moved shortly after and that he and his brothers did not like moving to Memphis because they "couldn't go out" and play like when they lived in Mississippi. He said that they were required to go to school, come home, clean the house, and then stay in the small apartment they were living in.

He stated that after he and his brothers had cleaned the house, their mother would inspect their cleaning either by using a white glove or checking certain items to see if they had been cleaned. If the cleaning was not up to her standards, "she would just go on a rampage" and "whoop" them. He stated that she used "extension cords" or a "water hose." He said that she "whoop[ed] them with an old water hose that she cut to arm's length. He further stated that she only hit them in "nonvisible areas." He recalled that she told the children that "[w]hat goes on in our house stays in our house." He said that the Petitioner would usually get the worst of the beatings. He stated that the beatings occurred at least once a week and that, sometimes, their mother would beat them until they bled. After the beatings, their mother would treat the wounds with peroxide. He testified that he had scars from the beatings. He related that on one occasion, their mother forced him to help her "hog tie" Cornelius Cole with an orange outdoor extension cord. She then beat Cornelius Cole with the extension cord. Johnathan Cole related that his mother made them stand outside naked in the wintertime when their parents caught them smoking. He stated that he and his brothers stood outside laughing. He testified that their father never physically punished him; however, he stated that their father did "whoop" Cornelius and the Petitioner for setting a field on fire.

Johnathan Cole described his parents' relationship while living in Ashland as "rocky." He testified that he witnessed their mother "endure[] beatings from [their] father." He also stated that "[t]here were drugs" in the home. However, Johnathan Cole recalled that once the family moved to Memphis, their parents' relationship improved.

Johnathan Cole described his mother's family as the "religious side" of the family. He stated that their grandfather, Bernel Hoyle, was a pastor. His maternal grandparents lived in Ripley, Mississippi. He recalled that his maternal grandparents would "whoop[] [them] when [they] got out of line." However, he testified that the Petitioner was very close with his paternal grandparents. Specifically, the Petitioner clung to their great-grandmother, Mattie Cole, who treated the Petitioner as her baby and "shielded [him] from whoopins." When Mattie Cole passed away in 1995, the Petitioner "cried the most at her funeral." Johnathan Cole stated that the Petitioner began running away shortly after Mattie Cole's death.

Cornelius Cole, the Petitioner's oldest brother, testified that the move to Memphis was a big adjustment, in part, because they had no family in Memphis. He said that he and the Petitioner attended Goodlett Elementary when they first moved to Memphis and that they walked to and from school together. He said that they did not feel safe because people would chase them and try to "jump" them.

Cornelius Cole testified that he witnessed many arguments between his parents. On at least one occasion, he witnessed his father hit his mother. Cornelius Cole described the "whoopins" his mother would give them. He said that she would hit them with different objects. Sometimes he would bleed from the beatings, but she would "doctor" the wounds with peroxide and bandages. He also recalled that his mother gave him money that he had to deliver to another man in exchange for a package wrapped in aluminum foil. When he got older, he understood that the packages contained drugs.

Cornelius Cole testified that he and the Petitioner started to run away from home together when the Petitioner was 12. He said that at first, they would leave for a day or two but that they eventually began to stay away from home for approximately a week and a half. He said that his first juvenile arrest occurred when he was 15 years old and that he was eventually committed to Wilder juvenile facility in 1995. When he was released from Wilder, he learned that the Petitioner had begun to smoke marijuana. He stated that they began smoking marijuana together. Cornelius Cole admitted that he was incarcerated at Parchman Prison in Mississippi during the time of the Petitioner's trial. However, he stated that if he had been contacted by the Petitioner's attorneys, he would have testified.

Sam Pearson testified that he is married to Cathy Cole's sister, Janet. He remembered that when the Petitioner's family moved to Memphis, he would sometimes help the family financially. Mr. Pearson testified that he never witnessed either Roy or Cathy Cole physically disciplining their children. However, he witnessed one occasion where Roy Cole slapped Cathy Cole. He said that, during that incident, Roy Cole had a gun. Mr. Pearson remembered telling Roy Cole that he should not use a gun because "accidents happen." He stated that he eventually learned that there was also some drug use going on in the household. He testified that the Petitioner's attorneys never contacted him.

Crystal Williams, the Petitioner's aunt, testified that the Petitioner's family was not doing well financially when they first moved to Memphis. She testified that she was aware that both Roy and Cathy Cole had extramarital relationships and that she witnessed episodes where Roy Cole would get angry and "t[ear] the house up." She stated that both Roy and Cathy Cole used cocaine. She said that she saw Cathy Cole hit the children with a belt or a switch.

Casell Randle testified that he first met the Petitioner when Mr. Randle worked with Roy Cole at Covington Pike Toyota. At that time, the Petitioner was 12 years old. He testified that the Petitioner was a "good kid" and that the Petitioner was a friend of Mr. Randle's son. He stated that he was aware that the Petitioner was charged with a felony in 1995 and was placed in jail because he went with Roy Cole to visit the Petitioner at jail. Mr. Randle explained that the Cole family was struggling financially at the time. He said that he and Roy Cole had a very close relationship and that he was aware that Roy Cole was using drugs and engaging in extramarital affairs.

Mr. Randle testified that he observed Cathy Cole hit the oldest child, Cornelius Cole, with a belt. He explained that Cathy Cole had asked Cornelius Cole to do something and that he did not want to do it. Mr. Randle attended a family meeting regarding the Petitioner's case on June 26, 2001; however, the Petitioner's attorneys never spoke with him privately concerning the Petitioner's family life or social history.

Violet Grant testified that she and the Petitioner have a daughter who was born on February 23, 2001, and that she knew the Petitioner by the name "Kenyata." She described the Petitioner's family as "very strict, neat and clean." She testified that the Petitioner smoked at least "six blunts [of marijuana] a day" and that when she met the Petitioner he was not doing well financially. At times, the couple had to sleep in her Toyota Camry. She testified that when she became pregnant with their child two weeks after they started dating, the Petitioner was very happy about having a baby. However, Ms. Grant ended the relationship in September 2000 because the Petitioner never had any money. She recalled that the Petitioner was very upset when she ended the relationship and that he tried to reconcile with her.

Ms. Grant testified that the Petitioner came into her residence and climbed into bed with her on the night that Santiefe Thomas was killed. She recalled that the Petitioner was "shaking and was real, real cold." Ms. Grant said that the Petitioner told her that "[he] just shot somebody." She said that she had never seen the Petitioner with a gun and that he did not appear to be a violent person.

Wanda Jones, a retired Memphis City school teacher, testified that she was a third grade teacher at Knight Road Elementary during the 1989-90 school year. She described the environment at Knight Road Elementary as "pretty rough" due to a large segment of the school population coming from the Walter Simmons Housing Project. She testified that she was once mugged at the school at 7:15 a.m. She also testified that drugs were a common problem at the Knight Road Elementary campus.

Ms. Jones testified that the Petitioner was one of her students at Knight Road Elementary in the year that he repeated third grade. Ms. Jones testified that the Petitioner

made a D in her class and that the Petitioner had an IQ between 72 and 82. She said that the Petitioner was in the "gray area." She explained that children in the "gray area" were usually those who "fell through the cracks" of the school system. She further explained that:

> Detrick was in that gray area, those kids who have difficulty learning. Who need help, whether it be a reading disability, or a math disability, or like some type of learning disability. They don't pick up by repeating the grade.

Ms. Jones stated that she was not interviewed by the Petitioner's attorneys but said that had she been asked to testify, she would have testified at the Petitioner's trial.

### iii. Expert testimony

Dr. Richard Dudley, a psychiatrist, testified that he was retained to conduct a psychiatric evaluation of the Petitioner in preparation for the post-conviction evidentiary hearing. Dr. Dudley testified that he met with the Petitioner at Riverbend Maximum Security Institution in Nashville on two occasions and that he spent a total of 12 hours with the Petitioner. Before meeting with the Petitioner, Dr. Dudley reviewed the Petitioner's school records, criminal records, affidavits or interviews of the Petitioner's family members, and the preliminary report of the neuropsychological evaluation of the Petitioner that was performed in January or February 2007. Dr. Dudley explained that in interviewing the Petitioner, he looked for any signs or symptoms of mental health difficulties and simultaneously performed a mental status assessment on the Petitioner. After conducting his clinical interview with the Petitioner, Dr. Dudley conducted similar clinical interviews with the Petitioner's parents, his brothers, and a great-aunt.

Dr. Dudley and the Petitioner discussed the Petitioner's early life in Mississippi and the violence that was occurring at home within his immediate family. Dr. Dudley related that "there was clearly a significant problem there with domestic violence in the home, of a pretty severe type between the mother and the father that he and his brothers were exposed to on a very, very regular basis." He explained that "the mother was, in fact, hurt, guns were pulled." From a psychiatric point of view, Dr. Dudley opined that the unpredictability of the violence left an individual "always kind of on edge." He added that the violence occurred without regard to the children. Dr. Dudley testified that the Petitioner related incidents where his mother was "left bruised and bloody and running out of the house trying to get away." Dr. Dudley described the Petitioner as "anxious and jumpy" when discussing the domestic violence in his household. He added that "[s]ometimes [the Petitioner] was crying" while describing the domestic violence he had witnessed.

Dr. Dudley testified that when the family lived in Mississippi, the Petitioner's mother

was available to her children; however, when she started working, the children spent a lot of time with the paternal great-grandparents. He stated that Roy Cole was "essentially not available" because Roy Cole was involved with his business, hobbies, and friends.

Dr. Dudley stated that when the family moved to Memphis, there was a "dramatic change." The domestic violence ended shortly after the move. Dr. Dudley explained that there was a major incident between Roy and Cathy Cole and that because of this incident, the police were called. It appeared that police intervention had a large impact on stopping the violence between the parents. Dr. Dudley remarked that although the violence had dissipated, the relationship between Roy and Cathy Cole continued to be "chaotic and tense." Dr. Dudley related that both parents were using cocaine and both were involved in marital infidelities. Dr. Dudley surmised that there "was always this sort of sense of instability" in the family.

Dr. Dudley testified that Cathy Cole inflicted both psychological and physical abuse on the Petitioner and his brothers. He recalled that the Petitioner reported that the brothers were sometimes "[s]tripped naked and tied up. Beaten until the point where there were cuts and bruises." Dr. Dudley testified that he "received a very consistent picture of what the abuse from [Cathy Cole] was like."

Dr. Dudley testified that Roy Cole's behavior was more unpredictable than that of Cathy Cole. He explained that "[t]he father's abuse was somewhat really more frightening . . . because it included things like being hit over the head with a two-by-four, or having a gun pulled on you." Dr. Dudley added that in addition to the physical abuse, there was also psychological abuse in the household. He said that there were "lots of reports" of the parents telling the children such things as "'I wish we had never had you, I wish you were never born.'"

Dr. Dudley opined that the Petitioner's behavior was a direct result of the experiences that he had and that these experiences caused him to be "hyper [and] nervous" because the Petitioner was always expecting things to happen to him. He said that the Petitioner was having nightmares about the things that had happened in his home and that the Petitioner felt that his parents were not interested in him. As a response to these feelings, the Petitioner ran away from home. Dr. Dudley stated that the Petitioner never learned to regulate his behavior because neither of his parents ever made him feel safe or told him that things would be alright.

Dr. Dudley said that on November 10, 1994, 19 days before the Petitioner turned 15 years old, the Petitioner was suspended for the first time for skipping classes. Shortly following the suspension, the Petitioner ran away from home. Dr. Dudley testified that the

Petitioner was having difficulty in school because the Petitioner was "at a point academically . . . where the cognitive deficits [were] beginning . . . to really present a problem." Dr. Dudley stated that during this time period, the Petitioner was repeatedly suspended from school and repeatedly ran away from home.

Dr. Dudley testified that this cycle eventually led to a juvenile court intervention. During this same time period, the Petitioner's older brother, Cornelius, was sent to a juvenile facility where he was confined from July 12, 1995, until February 9, 1996. Dr. Dudley testified that on June 5, 1995, the Petitioner underwent a psychological examination that revealed that the Petitioner's IQ was 78. Dr. Dudley stated that an IQ of 78 was low. He added that there were several red flags in the evaluation. Specifically, he stated that the personality assessment indicated "evidence of feelings of insecurity and inadequacy." The evaluation also indicated that the Petitioner felt alienated from the social environment and that he tended to be excessively sensitive to other people. Dr. Dudley said that these assessments should have prompted further evaluation.

Dr. Dudley opined that "this [was] the tip of the iceberg of what was in fact going on with him at the time." He added that as a 15 year old, the Petitioner's brain was also not fully developed at that time. Dr. Dudley testified that the wide-spread consensus in the psychiatric community is that the frontal lobe of the brain, which is responsible for adult logical decision-making, is the last part of the brain to develop. He said that development begins in puberty and is not completed until the early 20s. In the Petitioner's case, the Petitioner's normal developmental deficit was intensified because of his difficulties at home, his constant running away, and the detention of his brother. Thus, the Petitioner was "even more impulsive" and prone to overreaction than the average 15 year old.

Relative to the Petitioner's prior conviction that occurred in November 1995, Dr. Dudley related that the Petitioner was taken into juvenile detention. On December 6, 1995, the Petitioner, who was born on November 29, 1979, was transferred to the Shelby County Jail following a juvenile transfer hearing, and the Petitioner remained at the Shelby County Jail until March 1996. Dr. Dudley said that the Petitioner described his confinement at the Shelby County Jail as "horrifying." The Petitioner told Dr. Dudley that he had been beaten by groups of inmates on several occasions. The Petitioner reported that he witnessed others being raped and "[s]tabbed and stuff." As corroboration of these claims, Dr. Dudley said that there was a civil lawsuit that related to the jail conditions at the time the Petitioner was confined at the Shelby County Jail.

Dr. Dudley testified that the Petitioner was eventually released from the Shelby County Jail and placed on probation. However, the Petitioner was reincarcerated at the Shelby County Penal Farm as the result of a probation violation. Dr. Dudley said that the

-38-

Petitioner described the penal farm as dangerous but not as bad as the jail. He added that after being released from the penal farm, the Petitioner "was never able to establish a very well functioning life after that." Additionally, Dr. Dudley testified that the Petitioner began using marijuana and alcohol in his early teenage years and that the Petitioner became dependent upon marijuana. The Petitioner informed Dr. Dudley that marijuana made him feel less anxious, less agitated.

Dr. Dudley testified that by late Summer 2000, the Petitioner was "essentially homeless." During this time, the Petitioner began a relationship with Violet Grant, who soon became pregnant. The Petitioner told Dr. Dudley that he wanted to develop a family and care for his child. The Petitioner was attempting to support himself by "participat[ing] with a group that was dealing marijuana and other drugs." Dr. Dudley described the Petitioner as the "low man on the totem pole." The Petitioner told Dr. Dudley that "he was periodically beaten by people he was selling for and through." Dr. Dudley concluded that in October 2000, when the offense occurred, the Petitioner was not functioning very well.

Relative to the Petitioner's overall mental health, Dr. Dudley testified that the Petitioner suffered "from several mental illnesses." Dr. Dudley concluded that based upon the trauma he experienced growing up and while incarcerated, the Petitioner suffered from post-traumatic stress disorder (PTSD). He said that the Petitioner suffered "physiological symptoms associated with . . . traumatization" due to his early and repeated exposure to violence. Dr. Dudley stated that at the time of the offense, the PTSD was worsened "by some of the difficulties and beatings and things that he experienced on the street." He further opined that the Petitioner's attempts to manage his symptoms of PTSD through the use of alcohol and marijuana resulted in a psychological dependence upon marijuana. Dr. Dudley concluded that the Petitioner also suffered from "chronic depression that goes along with [PTSD] and those feelings of insecurity and uncertainty about himself." Dr. Dudley discussed the cognitive difficulties suffered by the Petitioner due to the trauma that he suffered at an important developmental stage of his adolescence. Relative to the Petitioner's current condition, he stated,

> [I]t's clear that those frontal executive functions are still a struggle for him. His working memory, the kinds of information that you have to kind of keep in your head to make those sorts of decisions is weak. And his capacity to kind of abstract and conceptualize and weigh decisions is not mature. It never really matured.

Dr. Dudley opined that all of these psychiatric problems contributed to the Petitioner's behavior at the time of the shooting. He added that the acute stressors associated with living on the streets and preparing for the birth of a child exaggerated these psychiatric problems

at the time of the offense.

Dr. Pamela Auble, a neuropsychologist, testified that she conducted a neuropsychological evaluation of the Petitioner in preparation for the post-conviction evidentiary hearing. In preparing for her evaluation, Dr. Auble reviewed information about the Petitioner's family, interviews from his family members, school records, medical records, and court records. Dr. Auble also reviewed Dr. Dudley's report. Dr. Auble met with the Petitioner on January 22, February 1, and February 5, 2007, for the purpose of administering numerous tests, including tests for malingering, personality testing, and the WAIS-III. Dr. Auble testified that the WAIS-III test revealed that the Petitioner had a full-scale IQ of 90. Dr. Auble explained that the 1995 intelligence test that indicated an IQ score of 78 was only a verbal IQ test. She further explained that the increase in the Petitioner's score could be attributed, in part, to the fact that the Petitioner had been in the Graduate Equivalency Diploma (GED) program for several years while incarcerated. Dr. Auble said that even though the Petitioner attended several years of GED classes, she compared the Petitioner's cognitive function with a seventh grader's cognitive function because he had not yet successfully passed the GED.

Dr. Auble stated that the Petitioner's lowest testing score was on the verbal abstract reasoning test. This test measures a person's "ability to see similarities, the ability to take details from experience and make a principle, make a reason or concept from particular instances." She explained that in this type of test, a person is given two words like dog and cat. The person must then say in what way those two words are alike. She stated that "[t]he abstract answer, if you're given a dog and a cat, is animals" because "[i]t's a category that they both belong to." As an example of the Petitioner's performance, Dr. Auble related that the Petitioner was asked how chair and table are alike. The Petitioner erroneously responded that they are both used for sitting. She explained that the Petitioner's overall score on this test was "about" in the fifth percentile and that the test was discontinued because the Petitioner was not performing well.

Dr. Auble next described the Wisconsin Card Sort test that was administered to the Petitioner. She stated that the test involved the sorting of 128 cards into continually shifting categories. The subject is not told how to match the cards into categories, but the subject is told when a match is correct or incorrect. When the person has correctly matched the category ten times in a row, the administrator arbitrarily shifts the category. After the subject has matched the new category ten times in a row, the administrator arbitrarily shifts the category again. The test continues until the subject has successfully matched six categories or has failed the test. The test, originally given to people who had surgeries due to seizures, revealed that persons who had frontal surgery did poorly on the test because they were unable to shift categories. Dr. Auble explained that the frontal lobe of the brain helps you plan out

actions to modulate behavior, to deal with the unexpected.

Dr. Auble testified that the Petitioner did "very poorly" on the Wisconsin Card Sort test. She explained that the Petitioner did not match any categories correctly. She stated that in 128 attempts, the Petitioner never correctly identified color as the first category even when he was told that his match was correct when he matched the cards by color. Therefore, the Petitioner was never able to shift sets because he never guessed the first category. She said that even when the Petitioner was told that a match was wrong, the Petitioner could not "come up with what to do next, so he ke[pt giving] the same incorrect response." Dr. Auble stated that the Petitioner's inability to sort correctly was not for lack of effort. She said that "[h]e [wa]s very precise about what he d[id]" and that he "line[d] [the cards] up very precisely, very carefully [and made] very neat piles." She stated that his performance was below the first percentile and that he exhibited signs of "perseveration" when he kept giving the same incorrect response even when he was told his response was incorrect. She stated that perseveration is "associated with a lot of different kind[s of] brain dysfunction."

Dr. Auble also administered several personality tests. She stated that the tests indicated that the Petitioner "ha[d] a lot of difficulty seeing [] the big picture." She explained that the Petitioner "is likely to have a lot of trouble" in "particularly complicated situations." However, Dr. Auble added that the test results also indicated that the Petitioner is likely to do well in the structure of a prison setting. Dr. Auble stated that she administered the Rorschach Personality test, or ink blot test; the personality assessment inventory (PAI); the incomplete sentences blank test; and the substances abuse subtle screening inventory.

Dr. Auble testified that the PAI is a screening test designed to test multiple emotional factors. Dr. Auble related that the testing indicated that the Petitioner was presenting an honest and accurate assessment of himself. She stated that the Petitioner scored slightly below average on the aggression scale. She added that the Petitioner "is very low on [the] dominance [scale] and high on [the] warmth [scale]." She stated that the warmth scale measured "how needy" an individual is for connection to others while the dominance scale measured how much an individual needed to be in control. When considered together, she explained that the Petitioner's warmth and dominance scores indicated that he was "naive and conforming and gullible." Dr. Auble testified that the results of the PAI revealed elevated signs of PTSD. She further explained that "[t]he results of the personality assessment inventory indicate[d] that he is likely to be easily upset and overwhelmed by stress, that he doesn't have a real good stress tolerance."

On cross-examination, Dr. Auble testified that during the period after his release from the penal farm and before his arrest for the murder of Santiefe Thomas, the Petitioner had a "very strange, very difficult" relationship with his parents. The Petitioner tried to avoid his

parents. Dr. Auble stated that the Petitioner now realizes that his parents were trying to give him advice and help him get on track but that he could not see that at the time due to all of his anger and marijuana use.

Dr. Auble testified that the Petitioner referred to the victim in this case as "Teefus" and that he considered the victim a friend. Dr. Auble opined that the Petitioner shot the victim because "he was mad at Teefus because Teefus owed him money." Dr. Auble testified that she reviewed the psychosexual evaluation ordered by the Shelby County Criminal Court in 1997. The 1997 report included the state-trait anger expression inventory. This test indicated that the Petitioner "had average amounts of anger but [that] he could not control his expression of anger at that time." Dr. Auble conceded that she did not know a lot about this test because she did not utilize this particular test in her practice.

Dr. Auble testified that the Petitioner reported a history of abuse inflicted by his mother. When asked to explain why he did not reveal these issues to his trial attorneys, Dr. Auble stated that "[i]t would probably be something that he wouldn't necessarily volunteer. . . . [I]f [he]'d had a . . . trusting relationship with his attorneys, I think it's very likely they could have elicited this information from him." She added that the Petitioner's disclosure of this information would depend largely upon "how much time [the attorneys] spent with him and what kind of relationship they had and how much they probed into these kinds of issues . . . . it's just not something he's likely to bring up . . . without being asked about it."

b. Post-conviction court's findings

Following the evidentiary hearing, the post-conviction court concluded that the decision not to present evidence of the abuse in the Petitioner's home was not based on sound reason when the evidence was readily available through several family members and juvenile court records. The post-conviction court further stated, "Counsel's decision to portray [the P]etitioner's actions as an atypical act in light of the fact that the [S]tate was relying on the prior crime of violence aggravating circumstance seems odd, at best." The post-conviction court stated because the State was relying on the Petitioner's previous convictions of attempted rape, robbery, kidnapping, and reckless endangerment, "the more reasoned course would have been for counsel to investigate [the P]etitioner's background with respect to potential abuse; mental deficiencies; and general background in an effort to offer some explanation for [the P]etitioner's actions." However, the court concluded that the "[P]etitioner should not now be allowed to contend that counsel was ineffective in failing to essentially draw this information out of [the Petitioner]." The court declined "to extend the same benefit of the doubt to trial counsel's utter failure to independently investigate juvenile records of the [P]etitioner and [the P]etitioner's brothers." In finding that counsel's representation was ineffective, the court further stated that "[t]he most basic level of representation called for counsel to follow up on the information contained in the juvenile

-42-

records."

Although the post-conviction court found that counsel's performance in failing to uncover and present significant mitigation evidence was deficient, the court determined that the Petitioner was not prejudiced by counsel's inaction. The post-conviction court reasoned that "[t]he proof supporting the aggravating circumstance was strong." Additionally, the post-conviction court questioned the willingness of the Petitioner's family to testify regarding the abuse. The post-conviction court determined that absent live testimony, counsel would have had to rely on the brief observations found in the Petitioner's juvenile court records. In this regard, the post-conviction court determined that "such proof would [not] have likely overcome the strength of the State's aggravating circumstance."

### c. Analysis

In death penalty cases, "the sentencer, in all but the rarest kind of capital case, [may] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record of any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604-05 (1978) (plurality opinion); see also Johnson v. Texas, 509 U.S. 350, 361 (1993). The United States Supreme Court has held that mitigating evidence is relevant to sentencing hearings and should be heard. See California v. Brown, 479 U.S. 538, 541 (1987); Eddings v. Oklahoma, 455 U.S. 104, 113-15 (1982). "'[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse.'" Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (quoting Brown, 479 U.S. at 545) (O'Connor, J., concurring)).

"There is no legal requirement and no established practice that the accused must offer evidence at [the penalty phase of a capital trial]." State v. Melson, 772 S.W.2d 417, 421 (Tenn. 1989). In fact, in many death penalty cases, counsel has properly decided not to offer any evidence at the penalty phase. Id. at 421; see also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985). Although there is no absolute duty to investigate particular facts or a certain line of defense, counsel does "have a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. Counsel's duty to investigate derives from counsel's basic function which is "to make the adversarial testing process work in the particular case." Kimmelman, 477 U.S. at 384 (quoting Strickland, 466 U.S. at 690).

In determining whether counsel breached this duty, counsel's performance is reviewed for reasonableness under prevailing professional norms, which includes a context-dependent

-43-

consideration of the challenged conduct as seen from counsel's perspective at the time. Wiggins, 539 U.S. at 523 (citations omitted). In this regard, counsel's duty to investigate is not limitless, see Washington v. Watkins, 655 F.2d 1346 (5th Cir. 1981); however, counsel's investigation must be reasonable in the context of the facts of the particular case and at the time of counsel's conduct. See Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000). When challenging the imposition of a sentence of death, the petitioner must show that "there is a reasonable probability that, absent the errors [of counsel], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Henley, 960 S.W.2d at 579-80 (citing Strickland, 466 U.S. at 695).

In determining whether trial counsel was ineffective for failing to investigate and present certain mitigating evidence, our supreme court has outlined several factors to consider in making such an evaluation. First, the reviewing court must analyze the "nature and extent of the mitigating evidence that was available but not presented." Goad, 938 S.W.2d at 371. Second, the court must determine "whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings." Id. Third, the court must consider "whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination." Id.

For the purposes of our analysis, the question presented is whether counsel knew or should have known about the child abuse; the domestic abuse; the illegal drug use and marital infidelities of the Petitioner's parents; the Petitioner's history of running away from home; and any other issues relative to completing an accurate portrait of the Petitioner. Following our review, we adopt, in part, the findings of fact and the conclusion of the post-conviction court that trial counsel was deficient in failing to present relevant mitigation evidence to present a complete and accurate picture of the Petitioner.

However, we disagree with the post-conviction court's finding that trial counsel should not be faulted for "failing to essentially draw this information out of" the Petitioner. Cornelius Cole testified that although he was incarcerated at the time of the Petitioner's trial, the defense team never contacted him concerning the Petitioner's family life. Dr. Auble testified that the Petitioner would not have volunteered this information without being asked about it – a fact not surprising given the Petitioner's limited cognitive ability, which notably was not discovered by trial counsel due to the lack of investigation. Furthermore, the family members present at the June 2001 meeting testified that they were not contacted or interviewed individually, and had they been, they would have testified regarding the extreme history of child abuse, drug abuse, and marital discord present in the Cole household. In consideration of the information known to the trial attorneys at the time of trial – the Petitioner's history of poor academic performance, running away from home, truancy, and early delinquent behavior – we conclude that trial counsel were deficient in failing to elicit

-44-

further information regarding the Petitioner's background either from the Petitioner or from family members, other than Petitioner's parents, in an individual setting.

Instead, trial counsel chose to inform the jury that the Petitioner was raised by two loving parents in a Christian household. Although the jury was presented with facts that there were some problems, the problems were presented as unique to the Petitioner despite the purported help and assistance of his family. The jury was not informed that the Cole family was not the happy loving family portrayed by trial counsel. The jury was not informed that the Petitioner faced intellectual challenges at school and emotional challenges at home. The jury was not informed that the Petitioner and his siblings were severely beaten by their mother. The jury was not informed that these beatings sometimes included stripping the children naked, "hog-tying" them, or forcing them to stay outdoors unclothed in freezing temperatures. The jury was not informed that the Petitioner and his siblings grew up in a household of marital discord, abuse, infidelity, and drug abuse. Lastly, the jury was not informed that the Petitioner's ability to make reasonable decisions was damaged as a result of his childhood. Simply put, the true picture of the Cole family was the antithesis of the loving family presented by trial counsel. Furthermore, the mitigation theory presented at trial that the Petitioner's behavior was an aberration, even based upon the scant information that trial counsel had gathered, was less than reasonable when considered with the Petitioner's prior delinquent and criminal behavior and his older brother's incarceration at the time of trial. Indeed, this evidence, without the accurate background information concerning the Petitioner's family life to place it into context, shows a natural progression of criminal activity. Accordingly, we conclude that counsel were deficient in their representation of the Petitioner because they failed to adequately prepare a mitigation defense in the penalty phase of the Petitioner's trial.

2. Failure to challenge the weight of the aggravating circumstance

The Petitioner contends that counsel failed to investigate the sole aggravating circumstance in the Petitioner's case and that counsel should have investigated: (1) the victim's background; (2) the facts and charges of the guilty plea; (3) the Petitioner's co-defendant; and (4) the fact that the weapon used in the offense was empty. Although the post-conviction court found that counsel's representation was "grossly deficient" concerning investigation of the aggravating circumstance, the Petitioner argues that the post-conviction court's finding that counsel's errors did not result in any prejudice was erroneous. The State does not contest the post-conviction court's finding but argues that the Petitioner cannot establish that he was prejudiced by the deficient performance.

a. Evidence presented at trial

The State sought imposition of the death penalty based upon the (i)(2) statutory aggravating circumstance – "that the defendant was previously convicted of one or more felonies other than the present charge, the statutory elements of which involved the use of violence to the person." In 1995, at age 15, the Petitioner was charged by indictment with the offenses of aggravated robbery, especially aggravated kidnapping, reckless endangerment, and aggravated rape. The State did not seek to transfer the Petitioner's case from juvenile court to criminal court; however, it appears that the case was eventually transferred to criminal court. The Petitioner later entered a plea, pursuant to North Carolina v. Alford, 400 U.S. 25 (1970), to the lesser charges of robbery, kidnapping, criminal attempt rape, and reckless endangerment. These four felony convictions arose from a single incident which occurred when the Petitioner was a juvenile.

Prior to the start of trial, lead counsel requested a pretrial determination as to whether the State's submitted felonies actually involved the use of violence to the person. Lead counsel argued that the statutory elements of the offenses did not necessarily involve violence and informed the court that all four of the prior convictions resulted from one criminal episode. The trial court then made inquiry of the State, who responded:

First, I think the court's have expanded, and the legislature has expanded that aggravator, Judge. They've amended the death-penalty statute, and the sentencing part regarding what evidence comes in to provide that - "Either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction" - the facts and circumstances and not just going on the face of the conviction alone. And if you want to have a- . . . . . Judge, I'll just say it to you, so you'll know what we're working with. The defendant pled guilty to a lesser offense in Division VIII. The facts were that he and his co-defendant in that case - the defendant had the gun, they robbed a customer at Tammy's Adult Bookstore at Getwell at gunpoint, took him into his car, drove him around, the defendant forced the victim to have oral sex on the defendant at gunpoint, played Russian Roulette, shooting the gun which did or did not have bullets in it. The defendant's plea, colloquy, and petition to suspend sentence said that it never had bullets in it, but nevertheless, he was pulling the trigger at the victim's head - drove around. The victim finally, in an attempt to get them a vehicle, which is what they wanted, was going to take him to the airport to a car rental place to rent them a car since they would get a car; and when they pulled up to the parking facility at the airport which had armed guards, the victim bailed out and yelled for help, and the armed airport security drew down on the defendant and co-defendant and took them into custody, so there was a [kidnapping], driving them around in the car. There

-46-

was a gun used to get the defendant into the car. There was a gun used to perpetrate the - and he pled to attempted rape, but it was, in fact, a completed rape and [kidnapping] - and the robbery when they took the car.

The trial court found that the facts as recited by the prosecutor were preliminarily satisfactory to show that the proof met the requirements for the aggravating factor (i)(2). No further discussions regarding the (i)(2) aggravator were held until the admission of the State's proof during the penalty phase.

During the penalty phase, Darrell Webster, the victim of the underlying felonies testified about the events surrounding the prior convictions. Mr. Webster stated that he was leaving Tammy's Adult Book Store when two men confronted him brandishing a weapon. Mr. Webster pleaded with the two men not to harm him. After a while, the man with the gun put the gun away and apologized for pointing the gun at him. They told Mr. Webster that they were brothers, that their mother had kicked them out of the house, and that they were hungry. Mr. Webster offered to take the two men to Waffle House and buy them something to eat. After they ate, the taller of the two men asked Mr. Webster to take them to their aunt's house. They could not remember where she lived so they drove to another location. Mr. Webster began to get uneasy. The taller man was driving his car, and Mr. Webster was in the back seat with the younger man with the gun. Mr. Webster identified the younger man as the Petitioner. He stated that the Petitioner began to spin the cylinder of the gun and placed the gun to the back of his head, playing "Russian Roulette." Sometime later, the Petitioner forced Mr. Webster to perform oral sex on him. Mr. Webster then told the men that if they took him to the airport he would rent a car for him. At the airport, Mr. Webster jumped out of the vehicle and ran for safety. Notably, neither lead counsel nor co-counsel cross-examined Mr. Webster.

b. Trial counsel's testimony at the post-conviction hearing

Lead counsel testified at the post-conviction hearing that she could not recall whether she argued that the Petitioner's prior convictions did not involve violence, as required by the statute. She recalled that other than the Assistant District Attorney General's description of the Petitioner's prior offenses, no "evidence [was] presented to the [c]ourt during its out of jury presence hearing[.]" She said that she did not file a written motion on the issue because she and co-counsel knew from experience what the trial court would do concerning the prior convictions. She said that they decided to reserve the issue for appeal because she questioned whether the convictions of reckless endangerment and attempted rape involved violence. However, she stated that the defense team believed that the trial court followed the

-47-

instructions of the Tennessee Supreme Court in determining whether the prior conviction qualified as a violent felony for purposes of applying the aggravating circumstance.

Lead counsel further testified that at the penalty phase to prove the aggravating circumstance, the State only presented the Petitioner's plea agreement and Mr. Webster's testimony. She stated that the transcript of the plea colloquy, the affidavit of complaint, and the arrest report were not presented to the court. However, she confirmed that Mr. Webster testified during the penalty phase of the trial that the Petitioner was the person with the gun. She recalled that at the time of the incident, Mr. Webster was 27 years old and that the Petitioner was 15 years old. She added that Mr. Webster testified that he felt comfortable with the Petitioner and Mr. Anderson.

Lead counsel acknowledged that she believed that the Petitioner was sentenced to lesser offenses in connection with this incident because "it appears as if Mr. Webster came into contact with [the Petitioner] and his co-defendant, near an adult book store and that Mr. Webster was interested in sex with them." Lead counsel testified that she "thought" that co-counsel cross-examined Mr. Webster regarding these issues. However, she recalled that Mr. Webster's testimony was very emotional. She stated that from a strategic perspective it would have been unwise to instigate a personal attack on Mr. Webster.

Lead counsel testified that Mr. Nally was generally responsible for investigating the facts and circumstances of any prior convictions, in addition to the facts and circumstances of the charged offenses. However, lead counsel could not recall whether Mr. Nally investigated the facts and circumstances of the Petitioner's prior convictions. She recalled that A.C. Wharton had handled the Petitioner's guilty pleas to the prior convictions. She could not recall obtaining the affidavit of complaint or the Memphis Police Department arrest reports concerning any of the prior convictions. Lead counsel conceded that, at the time of the Petitioner's trial, Mr. Wharton was the Shelby County Public Defender. Mr. Nally testified that he could not recall investigating the facts of the prior crime involving the Petitioner.

c. New evidence and testimony at the post-conviction hearing

i. Mr. Webster's Background

The Petitioner contends that had trial counsel adequately investigated the Petitioner's prior convictions, counsel would have uncovered relevant information about Mr. Webster's past. The Petitioner further contends that this information may have impacted the jury's

consideration of the weight of the aggravating circumstance. The State responds that the jury heard all of the facts pertaining to the nature of the encounter from the victim. The State further responds that information regarding the victim's past would not have been relevant and admissible because the uncovered information did not have any probative value relative to the victim's credibility or the application of the aggravating factor. Additionally, the State responds that application of the rape shield law in the penalty phase of the proceeding would have prevented introduction of evidence regarding the victim's prior sexual behavior.

At the post-conviction hearing, Ronald Lax, a private investigator with Inquisitor, Inc., testified that his company was retained by A.C. Wharton to perform services in the 1995 aggravated robbery case involving the Petitioner. Mr. Lax read a portion of the September 27, 1996, letter from A.C. Wharton inquiring about services:

> I need to engage your services in connection with the above referenced case. This case involves what is commonly known as a punk robbery. The so called victim, Mr. Darrell Webster admits that he picked up my client and the co-defendant outside a smut shop on Getwell and took them to breakfast at the Toddle House.

Mr. Lax testified that his office located and interviewed Mr. Webster and that the substance of the interview was retained in their file. Mr. Lax testified that the audiotape of the transfer hearing indicated that Mr. Webster was involved in a previous juvenile court case in which he made questionable criminal allegations against another juvenile. In that case, Mr. Webster claimed a teenage boy had stolen his car from a party at his home after Mr. Webster had taken the boy home with him. The juvenile told police that Mr. Webster had only charged him with a crime after he had spurned Mr. Webster's sexual advances. Mr. Lax explained that his office retained all of their files and that this information would have been available to the capital murder defense team in 2000.

Terryl Buckner, a bail bondsman, also testified at the post-conviction hearing. Mr. Buckner said that he ran and managed Club Escape from 1995 until 1998. He testified that Club Escape was "[a] gay club." He stated that Mr. Webster was a bartender at the club. He stated that he was aware that young boys would prostitute themselves in the area. Mr. Buckner identified a photograph of Andrew Bell, the accused juvenile in Mr. Webster's automobile theft case, as one of the young boys he often saw on the street during that time period.

The Petitioner also cites to trial counsel's failure to obtain Mr. Webster's hand-written

witness statement. In this statement, Mr. Webster acknowledged that Mr. Anderson had pulled the gun on Mr. Webster but then apologized. Mr. Webster invited both the Petitioner and Mr. Anderson into his car and then to Waffle House. Mr. Webster was aware that the Petitioner and Mr. Anderson were juveniles when he extended the invitation. Mr. Webster purchased the Petitioner and Mr. Anderson food at Waffle House and sat with them without attempting to flee or get help. After the meal, Mr. Webster invited the Petitioner and Mr. Anderson back to his vehicle.

Specific to the Petitioner's claim that trial counsel were ineffective in their investigation of Mr. Webster's background and history of prior complaints involving juveniles, the post-conviction court found:

> Trial counsel's preparation as it relates to the sole aggravating circumstance in this case is shockingly inadequate. Even if proof about the circumstances surrounding petitioner's prior offenses and/or evidence relating to the credibility and background of the victim of those offenses was insufficient to preclude their use as an aggravating circumstance, such proof was surely relevant for purposes of challenging Webster's testimony during the sentencing portion of petitioner's trial.

We agree with the post-conviction court's finding that counsel's representation concerning the aggravating circumstance was inadequate. The evidence presented at the evidentiary hearing clearly established that the information concerning the prior offense was readily available to defense counsel had they sought to find it. This information was highly relevant to the weight of the aggravating circumstance.

### ii. Facts of charges and guilty plea

The Petitioner contends that counsel failed to discover the case history regarding the 1995 offenses that would have diminished the weight attributable to this aggravating factor. Specifically, the Petitioner contends that the records of the prior convictions reveal (1) that the State sought to transfer co-defendant Anderson but not the Petitioner for the prosecution of the 1995 charges; (2) that the State, in juvenile court, intended to dismiss the charges of aggravated rape and especially aggravated kidnapping against both the Petitioner and Mr. Anderson; (3) that after being transferred to criminal court, the Petitioner entered Alford pleas, and (4) that the Petitioner received a suspended sentence and went on probation following his guilty pleas. The State responds that the Petitioner's claim is "based on

-50-

speculation and innuendo." The State asserts that the Petitioner's case was transferred to criminal court and that this information would not have affected the outcome of the penalty phase of the Petitioner's trial.

Transfer to criminal court

At the post-conviction hearing, Mr. Lax confirmed that his office would have also obtained and maintained a tape recording of the transfer hearing. Through the testimony of Mr. Lax, a portion of the audio tapes were introduced as evidence. The following portion of the audio tape was played:

> I have reviewed the matter with Mr. Webster the victim, who is present in the courtroom as it relates to – we are asking for the [c]ourt to consider transferring the matter of Tommy Anderson. We are not requesting that matter as it relates to Detrick Cole and the [S]tate will not be proceeding in the matter of Cole on the charges of kidnapping and for aggravated rape.

Mr. Lax testified that the transcript of the transfer hearing indicated that the State dismissed some counts of the indictment and did not initially seek to transfer the Petitioner's case to adult court. All of this information was available and obtainable through a reasonable investigation.

The post-conviction court characterized counsel's performance regarding the failure to investigate the case history of the Petitioner's underlying convictions as "grossly deficient."

The audiotape of the juvenile transfer hearing clearly indicates that the State was opting not to transfer the Petitioner to criminal court. Following our review, we agree with the Petitioner that this was an important fact that should have been presented to the jury at the penalty phase of his trial. Thus, we agree with the Petitioner's assertions that counsel's failure to make such preliminary and rudimentary investigations into his prior convictions amounted to deficient performance.

Culpability of the Petitioner and his co-defendant

The Petitioner contends that counsel's failure to investigate the conduct of the Petitioner's older co-defendant, Mr. Anderson, was ineffective and that counsel's

-51-

ineffectiveness prejudiced the Petitioner. The Petitioner asserts that a proper investigation would have revealed that it was the 17-year-old Mr. Anderson who was the leader in these offenses. He asserts that it is likely that Mr. Anderson's leadership role in these underlying crimes would have played a role in the jury's evaluation of the culpability of the Petitioner and the weight afforded the aggravating circumstance. The State responds that the facts of the crime negate the Petitioner's assertion that he was merely a minor participant in the crime. Further, the State asserts that the jury heard the details of the crimes and determined the appropriate sentence for the Petitioner.

In general, the post-conviction court found that counsel's performance concerning the investigation and challenge to the weight of the aggravating circumstance was "shockingly inadequate." Mr. Webster's statement, presented for the first time at the evidentiary hearing, indicates that Mr. Anderson initiated the initial confrontation with Mr. Webster. Mr. Webster reported that it was Mr. Anderson who was initially armed with the gun; that Mr. Anderson, not the Petitioner, demanded the car keys; and that Mr. Anderson took the car keys and drove the vehicle. Following our review, we agree with the post-conviction court that counsel's failure to investigate and discover information concerning the Petitioner's relative culpability for the prior offenses amounts to deficient performance.

### iii. Evidence that an empty revolver was used in the 1995 offense

The Petitioner contends that counsel's failure to present evidence from the police report indicating that the revolver used in the offenses against Mr. Webster was empty was deficient performance which prejudiced his trial. The State concedes that this information was not presented to the jury but contends (1) that the Petitioner has presented no proof that the gun was empty; (2) that the Petitioner pled guilty to reckless endangerment; (3) that the State never suggested that the gun was loaded; (4) that the Petitioner has not presented any evidence that would undermine his conviction of reckless endangerment; and (5) that any mitigating effect of this information is negated by the fact that the Petitioner possessed the victim's watch and beeper at the time of his arrest. The State further responds that the post-conviction court properly denied post-conviction relief because introduction of these facts would not have changed the outcome of the penalty phase.

As previously stated, the post-conviction court found that counsel's investigation and challenge to the weight of the aggravating circumstance was inadequate. As it relates to his claim that counsel failed to present evidence that the gun used in the prior offenses was not loaded, this information was contained in the police report; trial counsel did not obtain the police report, although it was readily available. Following our review, we believe that this

information was relevant and important in disputing the weight of the aggravating factor. Accordingly, we agree with the post-conviction court that counsel was deficient for failing to challenge the weight of the aggravating circumstance.

## 3. Prejudice

Concerning counsel's failure to investigate and present mitigation evidence, the post-conviction court found that counsel's performance was deficient. However, the post-conviction court also found that the Petitioner was not prejudiced by this deficient performance based upon its finding that the "proof supporting the aggravating circumstance was strong." Concerning counsel's failure to challenge the weight of the aggravating circumstance, the post-conviction court found that the combination of trial counsel's errors relating to the failure to investigate the Petitioner's prior convictions was "shockingly inadequate." Notwithstanding, the post-conviction court determined that "the prejudice to the petitioner was [not] so great as to require a new sentencing hearing." We disagree. While the proof presented at the sentencing hearing to support the aggravating circumstance was strong, that strength was, to a significant extent, a result of trial counsel's failure to challenge the weight of the aggravating circumstance. For the reasons stated below, we hold that the combined effect of counsel's failure to present significant mitigation proof and counsel's failure to challenge the weight of the State's aggravating circumstance severely prejudiced the Petitioner, so much so that the Petitioner was in effect without counsel during the sentencing phase of his trial.

The Supreme Court has explained that when analyzing a claim of ineffective of assistance of counsel at the penalty phase of a capital trial, the prejudice inquiry requires us to "reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534. Additionally, "[i]n assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 510.

Concerning the aggravating circumstance, neither lead counsel nor co-counsel cross-examined Mr. Webster at trial. Lead counsel testified at the evidentiary hearing that they were surprised by the State's presentation of him as a witness at the penalty phase. Had counsel adequately investigated the facts and the case history concerning the Petitioner's prior offenses, the jury would have been provided with (1) evidence concerning the credibility of Mr. Webster regarding the circumstances of the offense, as well as the circumstances of a prior incident involving Mr. Webster and a juvenile; (2) evidence from

-53-

the case history that the State initially did not seek to transfer the Petitioner to Criminal Court and that they sought to drop some of the charges; (3) evidence of the Petitioner's lesser culpability in relation to his co-defendant; and (4) evidence that the Petitioner entered a best interest guilty plea and was immediately placed on probation for these offenses. However, due to their lack of reasonable investigation, trial counsel failed to do any of these things. Certainly, this evidence had a direct correlation to the weight to be afforded the sole aggravating circumstance in this case. Accordingly, we conclude that counsel's limited investigation and failure to counter the prior conviction evidence resulted in prejudice to the Petitioner.

Relative to counsel's failure to investigate and present mitigation evidence, in Penry v. Lynaugh, 492 U.S. 302 (1989), the United States Supreme Court addressed the importance of informing the jury about the background and character of the defendant in a capital case when it stated:

> The sentencer must also be able to consider and give effect to that evidence in imposing sentence. Only then can we be sure that the sentencer has treated the defendant as a uniquely individual human being and has made a reliable determination that death is the appropriate sentence.

Id. at 319. Furthermore, the Court found in Boyde v. California, 494 U.S. 370 (1990), that the failure to present important mitigating evidence during the penalty phase can be just as devastating as failing to present proof of innocence during the guilt phase. The Court stated,

> [E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.

Id. at 380. Contrary to the post-conviction court's findings, we cannot conclude that the absence of this evidence did not have an impact on the jury. Rather, we conclude that there is a reasonable probability that the development and presentation of the history and pattern of abuse in the Cole household in addition to the evidence of marital discord, infidelity, and drug abuse would have changed the outcome of the penalty phase.

Additionally, we cannot disregard the focus of the prosecution on the substance of the

Petitioner's mitigation proof during closing argument. During closing argument, the Assistant District Attorney General stated,

> And you know, I wish everybody - every kid in this world had the opportunities, the chances, and the loving and caring support of his or her families that that man who did what he did to Mr. Webster, and that man who did what he did to Santeife had in his life. And he wrapped it all up, wadded it all up, and threw it in the gutter. He was going to do things his way. He was going to live his life his way [even though he told] the judge in '95, I know my mistake was not listening to my father. I'll follow him from now on. I'll go live with my family from now on.

These were essentially the last words argued by the prosecution in favor of the death penalty. While we cannot measure the impact of these words on the jury's decision, we conclude that counsel's failure to investigate and present an accurate depiction of the Petitioner's background resulted in prejudice that undermined the confidence in the result of the penalty phase. Furthermore, when considered in the context of the Petitioner's 1995 offenses as well as his older brother's incarceration at the time of the offense – things known even from the superficial investigation counsel conducted – the strategy for the penalty phase is unreasonable. In other words, "the quantum of evidence already known to counsel" should have "lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 510. Accordingly, we conclude that counsel's failure to investigate and present mitigation evidence prejudiced the Petitioner at the penalty phase of this trial.

Similar to the facts presented in this case, in Rompilla v. Beard, 545 U.S. 374 (2005), the United States Supreme Court determined that counsel were ineffective when they failed to investigate Rompilla's prior conviction. The prosecutor had placed trial counsel on notice that the facts of the prior conviction would be used as evidence of the aggravating circumstance in seeking the death penalty. Although the file was easily accessible to trial counsel, trial counsel neglected to review the file prior to trial. The Supreme Court held that "[n]o reasonable lawyer" would have failed to examine the readily accessible file in order to investigate the aggravation evidence it contained. Rompilla, 545 U.S. at 389. The Supreme Court went on to find that this failed investigation was prejudicial to Rompilla, concluding that:

> [I]t is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravating. The prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla's counsel had

a duty to make all reasonable efforts to learn what they could about the offense. Reasonable efforts certainly included obtaining the Commonwealth's own readily available file on the prior conviction to learn what the Commonwealth knew about the crime, to discover any mitigating evidence the Commonwealth would downplay, and to anticipate the details of the aggravating evidence the Commonwealth would emphasize. Without making reasonable efforts to review the file, defense counsel could have had no hope of knowing whether the prosecution was quoting selectively from the transcript, or whether there were circumstances extenuating the behavior described by the victim.

Id. at 385-86.

Also, of remarkable similarity to this case, the Supreme Court, in Rompilla, further concluded that the unexamined court file led to mitigating evidence of sufficient persuasive power that counsel's ineffective assistance had prejudiced Rompilla. The file revealed that both Rompilla's parents were severe alcoholics who drank constantly and that Rompilla's father "frequently beat Rompilla's mother." Id. at 391-92. Rompilla's father abused him physically and verbally. Id. at 392. Medical experts discovered that Rompilla had organic brain damage and had likely suffered from fetal alcohol syndrome. Id. The Court concluded that "[t]his evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test." Id. at 393. Since the mitigating evidence, taken as a whole, "might well have influenced the jury's appraisal of [Rompilla's] culpability," the Court remanded either for resentencing or for stipulation to a life sentence. Id.

Our conclusion concerning trial counsel's deficient and prejudicial performance at the penalty phase is bolstered by the fact that Tennessee is a "weighing" state and that the State sought application of only one statutory aggravating circumstances. It is highly probable that the introduction of the available mitigating evidence could have tipped the scales in favor of a sentence less than death. With consideration of the evidence that was available and yet omitted, we conclude that absent trial counsel's deficiencies, there is a reasonable probability that the result of his sentencing proceeding would have been different. Therefore, the Petitioner is entitled to a new penalty phase trial.

## D.  Proof of Aggravating Circumstance and Jury Instructions

### 1.  Failure to object to evidence of prior charges

The Petitioner contends that evidence in the form of the original indictment and testimony from Mr. Webster was erroneously offered in support of the aggravating circumstance.  The Petitioner asserts that counsel failed to object to the evidence of the prior charges and that introduction of the evidence violated his constitutional rights because the jury heard evidence relating to charges for which he was acquitted as a matter of law, thus violating the principle against double jeopardy.  The State concedes that counsel should have objected to the admission of the indictment but asserts that counsel was not ineffective for failing to object because the erroneous admission was harmless.  Likewise, the State asserts that appellate counsel was not ineffective for failing to raise the introduction of the indictment as an issue on appeal because the appellate court would have found the error harmless.  As to Mr. Webster's testimony, the State responds that this testimony was properly admitted as evidence of the facts and circumstances of the Petitioner's prior convictions pursuant to Tennessee Code Annotated section 39-13-204(c).

In denying relief on this issue, the post-conviction court found that "trial counsel was not remiss in failing to preserve the substance of [the Petitioner's] double jeopardy claim at trial" as there was not a double jeopardy claim.  The post-conviction court further found that "appellate counsel was not remiss in failing to raise this issue on appeal."

The State offers State v. Ivy, 188 S.W.3d 132 (Tenn. 2006) in support of its assertion that the error in admitting the indictments was harmless.  In Ivy, the supreme court concluded that admission of a defendant's indictment for first degree murder was harmless error when the State was attempting to establish that the defendant had been convicted of second degree murder, a crime involving violence to the person.  Ivy, 188 S.W.3d at 153-56.  In so concluding, the supreme court held that an indictment reflecting that the defendant had been charged with first degree murder was not "'evidence' of the 'facts and circumstances' of Ivy's prior conviction for second degree murder." Id. at 154 (quoting Tenn. Code Ann. § 39-13-204(c)).  However, this court has subsequently held that the opinion in Ivy simply addressed the issue of whether an indictment may be used by itself to prove the existence of a prior conviction and the facts and circumstances surrounding that conviction. State v. Richard C. Taylor, No. M2005-01941-CCA-R3-DD, 2008 WL 624913, at *30-31 (Tenn. Crim. App. March 7, 2008).

In Taylor, this court explained that an indictment may be used to "explain the facts surrounding the conviction" when additional documentation is offered in support of the actual conviction, namely, the certified judgment of conviction and the guilty plea. Indeed, the supreme court has similarly held that "indictments, as well as the convictions, were relevant to show the underlying facts of the offenses in order to establish that each offense involved the use or threat of violence to the person." State v. Smith, 755 S.W.2d 757, 764 (Tenn. 1988) (concluding that indictments alleging that the defendant had committed armed robbery and simple robbery were properly admitted in support of the aggravating circumstance when the defendant was ultimately only convicted of simple robbery), overruled on other grounds by State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992). Because the certified judgments of conviction were offered in support of the Petitioner's prior convictions, we conclude that admission of the indictments was not error. Accordingly, we also conclude that counsel was not ineffective for failing to object to their admission and that appellate counsel was not ineffective for failing to raise this issue on appeal.

Mr. Webster's testimony as to the facts and circumstances of the Petitioner's prior convictions was also admissible pursuant to Tennessee Code Annotated section 39-13-204(c), which provides, in pertinent part,

> In all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction. Such evidence shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground that the probative value of the evidence is outweighed by prejudice to either party.

Accordingly, we conclude that counsel was not ineffective for failing to object to Mr. Webster's testimony in support of the aggravating circumstance and that appellate counsel was not ineffective for failing to raise this issue on appeal.

2. Failure to object to jury instructions and improper argument by the State

The Petitioner contends that counsel failed to object to the trial court's improper instruction and the State's improper argument as to the standard used for considering the aggravating circumstance in the Petitioner's case. The Petitioner asserts that the trial court's

-58-

instruction erroneously related that each of the Petitioner's prior convictions constituted a separate and distinct aggravating circumstance when there was only one aggravating circumstance presented in his case – prior convictions that involved the use of violence. In support of his assertion, the Petitioner directs us to the verdict form, which lists each of the Petitioner's prior convictions as an aggravating circumstance. The State responds that while the Assistant District Attorney General referred to the prior convictions as "aggravators," the trial court properly instructed the jury on this issue. The State further responds that the jury was free to consider all of the prior convictions as evidence of the aggravating circumstance; therefore, the verdict form conveyed the jury's intent in this regard. The State also asserts that this court's opinion on direct appeal considered the issue and concluded that there was no error.

At trial, when instructing the jury, the trial court stated,

Tennessee law provides that no sentence of death or sentence of imprisonment for life without possibility of parole shall be imposed by a jury but upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances, which shall be limited to the following:

The defendant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person. The state is relying upon the crimes of Robbery, Kidnapping, Reckless Endangerment and Attempted Rape [] which are felonies, the statutory elements of which involve the use of violence to the person.

Members of the Jury, the court has read to you the <u>aggravating circumstances</u> which the law requires you to consider if you find proved beyond a reasonable doubt. You shall not consider any other facts or circumstances as an aggravating circumstance in deciding whether the death penalty or imprisonment for life without possibility of parole would be appropriate punishment in this case.

(emphasis added).

-59-

When the jury returned with their verdict, the jury had listed the crimes of robbery, kidnapping, reckless endangerment, and attempted rape under the heading on the verdict form which stated,

> (1) We, the jury, unanimously find the following listed statutory aggravating circumstance or circumstances:

> (Here list the statutory aggravating circumstance or circumstances so found, which must be limited to those enumerated for your consideration by the court in these instructions.)

In denying relief on this issue, the post-conviction court found that the issue was without merit as this court had considered the sufficiency of the verdict form on appeal and concluded that there was no error in the verdict form and that the form was sufficient.

On direct appeal, this court considered whether the verdict form was sufficient and ultimately concluded that the verdict form established that the jury had found the presence of the aggravating circumstance. This court compared the Petitioner's case to State v. McKinney, 74 S.W.3d 291 (Tenn. 2002), where the State relied on the same aggravating circumstance. In McKinney, the jury's verdict form listed the name of the underlying felony as the aggravating circumstance. McKinney, 74 S.W.3d at 303. The supreme court held that the verdict form was sufficient as the form cited the prior offense relied upon by the State and instructed by the court. Id. at 303-04. Indeed, the supreme court "has never held that the jury's verdict form must be an exact or verbatim statement of the statutory aggravating circumstances relied upon by the State." State v. Davidson, 121 S.W.3d 600, 618-19 (Tenn. 2003) (citing State v. Bland, 958 S.W.2d 651, 661 n. 6 (Tenn. 1997)). "The jury's verdict must be sufficiently clear, however, to indicate that the jury has found the elements of the aggravated circumstance or circumstances relied upon by the prosecution." Id. (citing McKinney, 74 S.W.3d at 303).

Having reviewed the instructions, we conclude that the jury in this case was properly instructed as to the aggravating circumstance relied upon in the Petitioner's case. We acknowledge that the trial court said "aggravating circumstances" after listing the aggravating circumstance relied upon by the State; however, the remainder of the instructions were clear. Additionally, when read as a whole, the instructions properly informed the jury that they should consider the four prior felonies as evidence offered in support of the sole aggravating circumstance sought in the case. We also acknowledge that the State used the term "aggravators" and that when the jury returned their verdict, the jury had listed the prior

-60-

offenses relied upon by the State in support of the aggravating circumstance. However, when the jury foreman was asked if they had determined that the aggravating circumstance had been proven beyond a reasonable doubt, the jury foreman responded in the affirmative.

Following our review, we conclude that the instructions provided by the trial court coupled with the instructions on the form provided to the jury, demonstrate that the jurors were properly instructed and returned a valid verdict in which they found the existence of the sole aggravating circumstance in the Petitioner's case. In so concluding, we acknowledge the Petitioner's letter offering State v. Lynch, 234 P.3d 595 (Ariz. 2010) as supplemental authority in support of his contention. However, we believe the facts in this case are materially different from Lynch in that the jury in this case was properly instructed. Accordingly, we conclude that trial counsel was not ineffective for failing to object to the verdict form or the manner in which the jury was instructed.

## IV. Eligibility for the Death Penalty

### A. Alford Plea

The Petitioner contends that he was ineligible to the receive the death penalty because he pled guilty in the previous cases pursuant to the Supreme Court's decision in Alford. The Petitioner states that in order to be eligible for the death penalty pursuant to the aggravating circumstance cited in his case, the trial court must conclude that the elements of the prior offense involved violence to the person. The Petitioner contends that he could not be sentenced to death pursuant to this aggravating circumstance when the statutory elements of his convictions did not necessarily include violence because by pleading guilty pursuant to Alford, he did not attest to any of the underlying facts of his convictions. Citing a Nevada Supreme Court case, the Petitioner concludes that the trial court erroneously determined that his prior convictions involved the use of violence. The State responds that the Petitioner's argument is grounded in the law of another state. The State further responds that the Tennessee Supreme Court affirmed the trial court's procedure in determining his eligibility for the death penalty and that this court and the Tennessee Supreme Court concluded that the prior convictions involved violence to the person.

We reject the Petitioner's argument. On direct appeal, the Tennessee Supreme Court affirmed the procedure used by the trial court in this case in determining that the Petitioner's convictions were prior felonies involving the use of violence to the person. Cole, 155 S.W.3d at 900-05. To that extent, this issue has been previously determined; therefore, the

Petitioner is not entitled to relief regarding this allegation. Tenn. Code Ann. § 40-30-106(h) ("A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing.")

## B. Trial Court Determination

The Petitioner contends that the trial court failed to follow the protocol set forth by State v. Sims, 45 S.W.3d 1 (Tenn. 2001), in determining whether the Petitioner's prior convictions involved the use of violence. Specifically, the Petitioner asserts that the trial court erroneously based its legal determination upon facts presented by the Assistant District Attorney General during the sentencing phase of the trial and not on the court documents that related to the convictions. The Petitioner contends that when a conviction is based upon a guilty plea, the trial court may only consider the legal records of the prior conviction. Thus, the Petitioner alleges that the trial court made an impermissible factual determination rather than a permissible legal determination mandated by the Supreme Court's decision in Shephard v. United States, 544 U.S. 13, 23 (2005), a case that was decided seven months before the Petitioner's sentence became final. The Petitioner further contends that trial counsel was ineffective for failing to properly preserve this issue for appeal when trial counsel conceded that the trial court's finding was supported by the record. The State responds that "the Tennessee Supreme Court thoroughly analyzed and approved the procedure utilized by the trial court;" therefore, any attempt to attack the procedure should be deemed waived. The State further responds that even if appellate counsel failed to raise the issue on direct appeal, the supreme court could have independently determined that the trial court's legal determination was incorrect if the record supported such a determination.

On direct appeal, the Petitioner argued that the procedure set forth in Sims was unconstitutional in light of the United States Supreme Court decisions in Apprendi v. New Jersey and Ring v. Arizona. The Tennessee Supreme Court rejected the argument, holding that the issue of whether a crime's statutory elements involve the use of violence is a legal question not a factual one; thus, holding Ring and Apprendi inapplicable. Cole, 155 S.W.3d at 904. The Tennessee Supreme Court held that, under Sims, the trial court is merely examining facts to determine which statutory elements served as the basis for the conviction and is not making "factual findings as to whether the prior conviction involved violence." Id.

In Sims, the supreme court approved a procedure in which the trial court, outside the presence of the jury, considers the underlying facts of the prior offenses to determine whether the elements of those offenses involved the use of violence to the person. If the trial court

determines that the statutory elements of the prior offense involved the use of violence, the State may introduce evidence that the defendant had previously been convicted of the prior offenses. The trial court then would instruct the jury that those convictions involved the use of violence to the person. See State v. Powers, 101 S.W.3d 383, 400-01 (Tenn. 2003).

Years after the Petitioner's trial, the supreme court revisited its decision in Sims. In State v. Rice, 184 S.W.3d 646, 668-69 (Tenn. 2006), the Tennessee Supreme Court considered the Sims procedure in light of the United States Supreme Court's decision in Shepard. In Shepard, the Court held that in determining the underlying character of a predicate offense to which the defendant had pled guilty, the trial court "is generally limited to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." Shephard, 544 U.S. at 16. When the prior conviction resulted from a jury trial, the trial court is limited to examining the charging documents filed in the court of conviction and instructions given to the jury. Id. at 20 (citing Taylor v. United States, 495 U.S. 575 (1990)). In Rice, the supreme court determined that "Shepard does not change a judge's ability to find the 'fact of a prior conviction'" but simply limited "the scope of the judge's inquiry to reliable judicial records regarding the prior conviction and precludes the judge from re-examining the facts underlying that conviction." 184 S.W.3d at 669. Similarly, the supreme court has held that "Shepard clarifies but does not invalidate the procedures this [c]ourt adopted in Sims." Ivy, 188 S.W.3d at 151. Thus, when the State alleges prior violent felony convictions, the statutory elements of which do not necessarily involve the use of violence to the person, the trial court must conduct the Sims analysis, limiting its inquiry to the records delineated by Shepard.

It appears that appellate counsel did not specifically challenge the Sims procedure on direct appeal. Regardless, the Tennessee Supreme Court implicitly determined that the trial court did not commit error in determining that the prior convictions involved the use of violence against the person. Cole, 155 S.W.3d at 905-06. Had the Tennessee Supreme Court determined that the Sims procedure was not properly followed, the court could have independently determined that there was error. Because this issue has been previously determined on direct appeal, the Petitioner is not entitled to relief on this basis. Tenn. Code Ann. § 40-30-106(h) ("A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing."). Accordingly, we conclude that counsel was not deficient for failing to object or to preserve this issue for appeal.

## C. Eligibility Erroneously Based on Juvenile Conduct

The Petitioner next contends that his prior convictions which resulted from conduct committed as a juvenile cannot serve as the sole basis for capital punishment because the Eighth Amendment bars capital punishment premised on juvenile conduct. The Petitioner contends that aggravating circumstances operate as elements of capital cases; therefore, the Petitioner satisfied an element of capital murder when he was a juvenile. The State responds that this claim was raised on direct appeal; therefore, this issue should be treated as previously determined. The State further responds that the post-conviction court properly denied relief on this issue.

The Petitioner's claim was rejected by our supreme court on direct appeal. Indeed, the supreme court concluded:

> The defendant contends that his death sentence was arbitrarily imposed because the criminal conduct resulting in the prior conviction on which the death sentence is based occurred when he was fifteen years old. In a recent case, State v. Davis, 141 S.W.3d 600, 618 (Tenn. 2004), this [c]ourt rejected the argument that prior conviction based upon conduct that occurred when the defendant was a juvenile cannot support the (i)(2) aggravating circumstance. As explained in Davis, this issue is without merit.

Cole, 155 S.W.3d at 905. Because this issue has been previously determined, the Petitioner is not entitled to relief on this basis. Tenn. Code Ann. § 40-30-106(h) ("A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing.")

## V. Constitutional Challenges to the Death Penalty

The Petitioner challenges the legality and constitutionality of capital punishment generally and lethal injection specifically. He also challenges the structure of Tennessee's capital sentencing system. The Petitioner seeks relief on these grounds and raises them to preserve the issues for future review.

## A. Tennessee and International Law

The Petitioner contends that the death penalty violates the Tennessee and United States Constitutions because the death penalty impinges upon his fundamental right to life and the prohibition against cruel and unusual punishment. The Petitioner further contends that the death penalty fails to promote any compelling state interest that would justify violating these crucial rights. The Petitioner also contends that appellate counsel's failure to raise his claims regarding these deficiencies on appeal violated the Petitioner's right to effective assistance of appellate counsel. The State responds that the highest court of this state has previously rejected these claims.

The Petitioner's argument that neither the Tennessee Constitution nor the United States Constitution permit capital punishment fails. Each document references capital punishment in a manner approving the use of the death penalty. See U.S. CONST. AMEND. V ("No person shall be held to answer for a capital . . . crime, unless on a presentment or indictment . . . nor be deprived of life . . . without due process of law. . . ."); Tenn. Const. art I, § 15 ("That all prisoners shall be bailable by sufficient sureties, unless for capital offences, when the proof is evident, or the presumption great."). Additionally, the Petitioner's complaint that the death penalty infringes upon his fundamental right to life is contrary to settled precedent as reflected in Cauthern v. State, 145 S.W.3d 571, 629 (Tenn. Crim. App. 2004) (citing Nichols, 90 S.W.3d at 604; State v. Mann, 959 S.W.2d 503, 536 (Tenn. 1997) (appendix); State v. Bush, 942 S.W.2d 489, 523 (Tenn. 1997)).

The Petitioner also asserts that lethal injection, the method of execution currently utilized by the Tennessee Department of Correction, constitutes cruel and unusual punishment. In support of his claim, the Petitioner asserts that Tennessee law precludes euthanization of animals through the use of the same drugs that the State would utilize in executing him. See Tenn. Code Ann. § 44-17-303. He adds that "[s]hortcomings in Tennessee's execution protocol, staffing of executions, and likelihood of human error further bolster this claim." The Petitioner relies upon the decision of a federal district court, finding that Tennessee's lethal injection protocol is unconstitutional. See Harbison v. Little, 511 F.Supp.2d 872, 883-84 (M.D. Tenn. 2007), vacated and remanded, 571 F.3d 531 (6th Cir. 2009). The Petitioner makes these complaints with acknowledgment that the United States Supreme Court has upheld the Commonwealth of Kentucky's three-drug lethal injection protocol as not being violative of the Eighth Amendment in Baze v. Rees, 553 U.S. 35 (2008).

The Sixth Circuit Court of Appeals, with reliance upon Bazes v. Rees, explicitly

-65-

rejected the district court's rulings in <u>Harbison v. Little</u> regarding Tennessee's lethal injection protocol. <u>See</u> <u>Harbison</u>, 571 F.3d at 537-39. Specifically, the Sixth Circuit Court of Appeals concluded that (1) a visual inspection of the inmate by the warden for consciousness was sufficient to protect the inmate's Eighth Amendment rights, (2) Tennessee's protocol provided sufficient criteria for the selection and training of personnel, and (3) Tennessee's protocol requiring the warden to be in the execution room in order to guard against problems and requiring the IV line to be monitored visually by other execution team members by video camera and through a one-way window are constitutionally sufficient. <u>Id.</u> at 537-39. In effect, the Sixth Circuit rejected the same arguments now posed by the Petitioner on appeal to this court.

Notwithstanding the decision of the Sixth Circuit in <u>Harbison v. Little</u>, this court is not bound by the decisions of the federal district and circuit courts of appeal. Rather, this court is bound (1) to follow the decisions of the Tennessee Supreme Court and (2) to follow the applicable constitutional rulings of the United States Supreme Court. <u>See</u> <u>State v. McKay</u>, 680 S.W.2d 447, 450 (Tenn. 1984), <u>cert. denied</u>, 470 U.S. 1034 (1985); <u>State v. Bowers</u>, 673 S.W.2d 887, 889 (Tenn. Crim. App. 1984); <u>State v. Green</u>, 995 S.W.2d 591, 600 (Tenn. Crim. App. 1998). Our state supreme court has consistently upheld Tennessee's three-drug lethal injection protocol. <u>See</u> <u>State v. Kiser</u>, 284 S.W.3d 227, 275-76 (Tenn. 2009), <u>cert. denied</u>, – U.S. –, 130 S.Ct. 229 (2009); <u>State v. Banks</u>, 271 S.W.3d 90, 160 (Tenn. 2008), <u>cert. denied</u>, – U.S. –, 129 S.Ct. 1677 (2009); <u>Abdur'Rahman v. Bredesen</u>, 181 S.W.3d 292, 297-98 (Tenn. 2005).[2] Accordingly, the Petitioner is not entitled to relief on this claim.

Next, the Petitioner asserts that the State violated Article VI, Clause 2 of the United States Constitution, the Supremacy Clause, when it sought the death penalty and thus disregarded his rights under customary international law and under treaties to which the United States is bound. Arguments that the death penalty is unconstitutional under international laws and treaties have systematically been rejected by the courts. <u>See</u> <u>State v. Odom</u>, 137 S.W.3d 572, 600 (Tenn. 2004). Accordingly, the Petitioner is not entitled to relief on this issue.

---

[2]We acknowledge that this issue is currently being reviewed in the case of <u>State v. Stephen Michael West</u>, No. M1987-000130-SC-DPE-DD (Tenn. Nov. 29, 2010) (order remanding the case to the chancery court for determination of constitutionality of method of execution). However, we will continue to follow the current holdings of the Tennessee Supreme Court on this issue.

## B. Tennessee's Capital Sentencing Scheme

### 1. Prosecutorial discretion

The Petitioner contends that the State of Tennessee erroneously vests absolute discretion in its 31 district attorneys general to decide whether to seek the death penalty in a first degree murder case. He asserts that while Shelby County accounts for just over 15% of the population of the entire state, between 40 and 50% of death sentences originate in Shelby County. The Petitioner contends that while Shelby County sought the death penalty in his case, another district would not have sought the death penalty. Thus, the absolute discretion provided by Tennessee causes the system as a whole to be arbitrary and capricious, thereby violating his constitutional guarantees of equal protection and due process. The State responds that this claim has been rejected by our supreme court and that the Petitioner is not entitled to post-conviction relief.

Our supreme court has rejected this argument. See Kiser, 284 S.W. 3d at 293; State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1995). Accordingly, we conclude that the Petitioner's argument must fail.

### 2. Systemic failures in Tennessee

Relying upon the inadequate and ineffective representation of trial counsel in the present case, the Petitioner contends that Tennessee is not fulfilling its constitutional obligation to ensure that indigent capital defendants receive adequate counsel and that Tennessee's failure to provide adequate counsel in capital cases violated his due process rights as guaranteed by the Tennessee and United States Constitution. The Petitioner states that his claim is highlighted by the fact that his case was handled by the "leader of the Shelby County Public Defender's capital unit." The State responds that this claim has been rejected by the highest court of this state; thus, the Petitioner is not entitled to post-conviction relief.

Obtaining competent representation in capital cases remains a serious concern of the judiciary of this state. However, there is no authority that the aspirational qualifications of counsel in a capital trial set forth in the American Bar Association standards or that the required qualifications of capital counsel set forth in Rule 13, Rules of the Tennessee Supreme Court, are constitutionally compelled. See generally Trent Starks v. State, No. W2005-02478-CCA-R3-PC, 2006 WL 3147059 (Tenn. Crim. App. Nov. 2, 2006), perm. app. denied (Tenn. Mar. 5, 2007). The Fourteenth Amendment guidelines simply require the

appointment of an attorney to a capital petitioner. While the Tennessee Supreme Court has put into place heightened requirements in Rule 13, including the requirements of two attorneys that meet certain specific eligibility criteria, the attorneys need not meet these stringent standards to pass constitutional muster. Id. Accordingly, we cannot conclude that there is a systemic failure in the appointment of competent counsel in capital cases in this state. The Petitioner's argument must fail.

### C. Proportionality Review

The Petitioner states that prior to his case, "no Tennessee jury had previously sentenced someone to death solely on the basis of minor conduct." The Petitioner contends that "the absence of similar sentences for similar cases" indicates that Tennessee has failed to ensure a meaningful proportionality review as required by state and federal law. The State responds that this court has previously determined this issue in the Petitioner's case; therefore, the Petitioner is not entitled to relief.

Our supreme court has repeatedly upheld the comparative proportionality review undertaken by the appellate courts in this state as meeting state constitutional standards. Kiser, 284 S.W.3d at 294, State v. Vann, 976 S.W.2d 93, 118 (Tenn. 1998) (appendix); State v. Keen, 926 S.W.2d 727, 743-44 (Tenn. 1994); State v. Barber, 753 S.W.2d 659, 663-668 (Tenn. 1988); State v. Coleman, 619 S.W.2d 112, 115-16 (Tenn. 1981). Moreover, this issue was raised in the Petitioner's direct appeal and was previously determined contrary to his contention. Cole, 155 S.W.3d at 907-08. Accordingly, we conclude that the Petitioner is not entitled to relief on this issue. Tenn. Code Ann. § 40-30-106(h) ("A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing.")

### VI. Cumulative Errors

The Petitioner contends that if this court concludes that counsel's errors do not constitute grounds for relief, then this court should conclude that the cumulative effect of counsel's errors violated the Petitioner's constitutional rights. The Petitioner asserts that cumulative error analysis is appropriate when a court is faced with addressing multiple errors that arise from separate constitutional violations. In this case, the Petitioner contends that the errors in the guilt and sentencing phase of the Petitioner's trial should all be considered when evaluating the fundamental fairness of the Petitioner's sentencing hearing. The Petitioner further contends that when these errors are considered together, the cumulative

effect of the errors supports the conclusion that the Petitioner is entitled to a new trial and sentencing hearing. The State responds that the Defendant is unable to establish that he was prejudiced by any of trial counsel's errors.

"We recognize that while individual errors may not necessitate [relief], the combination of multiple errors may necessitate reversal of a conviction in order to ensure a [petitioner] receives a fair trial." Chad Hughes v. State, No. M2008-01531-CCA-R3-PC, 2009 WL 1409776, *7 (Tenn. Crim. App. May 19, 2009) (citing State v. Zimmerman, 823 S.W.2d 220, 228 (Tenn. Crim. App. 1999)). As we have determined that the Petitioner is entitled to a new sentencing hearing because of counsels' deficient representation at the penalty phase of the Petitioner's trial, the only issue left to be determined is whether any errors at the guilt phase of the Petitioner's trial merit cumulative error relief. Relative to the guilt phase of the trial, we concluded that lead counsel was deficient for misstating the evidence in her closing argument; however, we concluded that this error did not prejudice the Petitioner. Accordingly, because we concluded that counsel erred in only one aspect of their guilt phase representation and that this error was not prejudicial, we cannot conclude that this one error merits cumulative error relief.

## VII. CONCLUSION

After a thorough review of the record, we conclude that counsel's failure to conduct adequate investigation into the Petitioner's background and counsel's failure to present significant mitigating evidence during the penalty phase of the Petitioner's capital trial suffices for a showing of deficient performance. Moreover, counsel's constitutionally deficient performance prejudiced the Petitioner's right to a fair penalty proceeding. It is the opinion of this court that there is a reasonable probability that absent the deficiencies, the outcome of the penalty phase of the trial might well have been different. Therefore, we conclude that the evidence preponderates against the findings of the post-conviction court, and the Petitioner's sentence of death is reversed. The case is remanded to the trial court for a new penalty phase proceeding. With regard to the guilt phase of the Petitioner's capital trial, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE